## C. H. OSTERBERG AND ANOTHER v. SECTION 30 DEVELOPMENT COMPANY.[1]

November 7, 1924.

No. 24,196.

**Oral testimony inadmissible to modify written contract.**

1. When parties have entered into a written contract, it is a general rule that, if the writing is complete upon its face and unambiguous, parol evidence is not admissible to in any way contradict or depart from the terms of the written instrument.

**Test to decide whether writing is complete.**

2. The criterion of the completeness of the written contract as a full expression of agreement of the parties is the writing itself; but, in determining whether it is thus complete, it is to be construed, as in any other case, according to its subject matter, and the circumstances under which and the purposes for which it was executed.

**Oral testimony admitted to complete writings.**

3. Record examined and *held*: (1) That the written instruments involved were incomplete and indefinite and that the reception of oral testimony as to the agreement of the parties did not violate the parol rule; (2) that plaintiffs by their conduct did not waive their right to have other parties do what such other parties had agreed to do.

Action in the district court for St. Louis county by the partners of Osterberg & Johnson to recover $9,614.01 for services performed. The amended answer alleged that the balance due, if anything, was

[1]Reported in 200 N. W. 738.

not over $8,058.15. The case was tried before Fesler, J., who denied plaintiffs' motion for a directed verdict, and a jury which returned a verdict for $13,121.68. From an order denying its motion for a new trial, defendant appealed. Affirmed.

*Jaques & Hudson* and *Clapp, Richardson, Elmquist, Briggs & Macartney,* for appellant.

*Archer & Rosemeier,* for respondents.

WILSON, C. J.

Plaintiffs were given a verdict for $13,121.68. From an order denying motion for new trial defendant has appealed.

In 1911 Mr. K. A. McDonald, the secretary of defendant company, became the lessee of certain ore lands on the Cayuna Range owned in fee by one Hopkins. McDonald conveyed to the plaintiffs a one-fourth interest in and to this lease. He conveyed the other three-fourths interest to defendant. An agreement was made between plaintiffs and defendant under which plaintiffs were to drill this land, they assuming and paying one-fourth of the cost, and billing the defendant for three-fourths of the drilling charge. The lease called for payment of 25 cents per ton royalty with a specified minimum amount to be paid annually. It is not disputed that defendant became indebted to plaintiffs in the sum indicated by the verdict. In July, 1913, the defendant company was in need of money to carry on its operations and there were then certain stockholders living in St. Paul, and in that month one of the plaintiffs, the defendant and the St. Paul stockholders, made and entered into some sort of an agreement. One part of this agreement was that the plaintiffs should wait for their money until the defendant could pay them from royalties accruing to defendant from the Hopkins lease.

What was the St. Paul agreement? Defendant claims that the agreement embracing the extension was complete in the writings evidenced by two letters; one an offer, and the other an acceptance, being Exhibits A and B, respectively, to the complaint. If the whole agreement was contained in the two letters, then the court erred in the reception of testimony. Plaintiffs claim that the

parties made an oral agreement which included the substance of the exhibits and considerably more. They claim that it was competent for the court to receive oral testimony in order to view the circumstances under which and the purposes for which the letters were written and that the letters construed in the light of such circumstances show that they were not meant to contain the whole bargain between the parties, and that it appears upon the face of the letters that they were not complete as embracing the entire agreement and that because thereof parol evidence was admissible to prove the terms of the agreement upon which the letters are silent and which terms are not inconsistent with the contents of the letters. Upon this theory the court received plaintiffs' evidence over objection.

When parties have entered into a written contract, it is a general rule that if the writing is complete upon its face and unambiguous, parol evidence is not admissible to in any way contradict or depart from the terms of the written instrument. Thompson v. Libby, 34 Minn. 374, 26 N. W. 1; Gasper v. Heimbach, 53 Minn. 414, 55 N. W. 559; Mueller v. Barge, 54 Minn. 314, 56 N. W. 36; 9 Encyclopedia of Evidence, p. 321.

The criterion of the completeness of the written contract as a full expression of agreement of the parties is the writing itself; but, in determining whether it is thus complete, it is to be construed, as in any other case, according to its subject matter and the circumstances under which and the purposes for which it was executed. Wheaton Roller Mill Co. v. John T. Moye Mnfg. Co. 66 Minn. 156, 68 N. W. 854; Potter v. Easton, 82 Minn. 247, 84 N. W. 1011; Samuel H. Chute Co. v. Latta, 123 Minn. 69, 142 N. W. 1048; Cargill Commission Co. v. Swartwood, 159 Minn. 1, 198 N. W. 536.

Under the admonition of this rule of law we find some indication from the letters themselves that they do not embrace the entire agreement.

The first letter is written by Mr. Clapp to the secretary of defendant, advising that subscriptions had been secured amounting to $4,000 and stating that "one of the conditions of the subscription

is that Capt. Bale and Osterberg and Johnson shall extend the time of payment of the amount due them until the company can pay them out of royalties received." Thus it appears that one of the "conditions" is named. It is not stated as *the* condition, but is couched in such language as to indicate that there is more than one condition. The silence of this letter also provokes the inquiry as to the amount of subscriptions which were to be acquired. In fact, it does not in any way specify what subscriptions are referred to. Nor does it specify what they were for, by whom made, nor for whom, nor for what purpose, nor when they were to be paid. The letter further announces that the St. Paul parties would not be willing to turn over their money until this agreement on the part of Captain Bale and Osterberg and Johnson was actually made in writing and in the hands of the company. How much money were they going to turn over? It is fair to assume that the agreement made between the parties must have specified some amount; otherwise they would hardly expect the plaintiffs to enter into an agreement of that nature.

On the following day the plaintiffs and Captain Bale answered this letter by writing Exhibit B in which they specifically agreed to the extension as suggested in the first letter. They say they do this "in view of what you say in your letter and of the stock subscriptions, etc., referred to therein." Again in this letter we find the indefinite reference as to the stock subscriptions and we also find "etc.," whatever that may be. Ordinarily it refers to others of the like kind, and the rest, and so on, and so forth. Webster, New International Dictionary. It is used to point out that other things which could be mentioned are to be understood. What were such other things? Do the letters disclose the meaning of the expression "until the company can pay them out of royalties received?" It is apparent that the only function of these letters was to definitely commit the plaintiffs to their agreement for the extension of time of payment. Aside from that they disclose but little of any transactions between the parties. They are incomplete and indefinite.

To learn the circumstances under which the letters were written and their purpose, the court received parol evidence relative to matters upon which the letters were silent and which were not inconsistent with the letters and such testimony, so received, tended to show that the St. Paul stockholders substantially agreed: (1) To subscribe for stock in defendant company to the extent of $5,000; (2) to take over section 39 and operate it and pay royalties to the fee owner; (3) to put up money to take care of immediate debts of defendant exclusive of its indebtedness to plaintiffs; (4) to finance defendant upon condition that the plaintiffs would give them 1/16 interest in the lease and the stockholders would surrender a certain amount of their promotion stock. The evidence was properly received by the court in reference to the oral agreement. It related to matters upon which the writing was silent, and it was not inconsistent with what was written. On December 31, 1915, defendant and plaintiffs entered into a sublease of the property to one Collins acting for the Breitung interests, calling for 40 cents per ton royalty, with a specified minimum amount to be paid annually. The parties were then indebted to Hopkins for $17,500 as royalties which were in arrears which the Breitungs agreed to pay by turning over the excess royalties due the lessees and the royalties due the fee owner directly to Hopkins, the fee owner. They did so and finally paid Hopkins in full in 1919.

Defendant now claims that plaintiffs waived performance of the oral agreement, for the reason that performance was prevented and rendered impossible by plaintiffs joining in the sublease to the Breitungs and because, it says, they conducted themselves as though no such terms and conditions ever existed. As bearing upon how the plaintiffs conducted themselves, it may be noted that the evidence shows that soon after the oral agreement was made a representative of the St. Paul stockholders made a new proposition which McDonald and plaintiffs declined, and then the St. Paul people did not do what the oral agreement required them to do. Two and a half years expired before the Breitung lease was made. The royalties to Hopkins had grown to $17,500 and were past due. There is nothing to indicate that the St. Paul parties ever intended to do

the things called for by the oral agreement other than to subscribe for stock to the amount of $5,000. We must assume that the St. Paul parties breached the contract. The jury has found that it was made and no one claims that it was performed. Plaintiffs did what they did do in an apparent good faith effort to protect their interests at a time when the other parties were not protecting such interests. It cannot, therefore, be claimed that plaintiffs waived the right to have the St. Paul stockholders do what they agreed to do.

Affirmed.