# THE DAYTON COMPANY v. CARPET, LINOLEUM AND RESILIENT FLOOR DECORATORS' UNION, LOCAL NO. 596, AFL, AND OTHERS.[1,2]

June 24, 1949.

No. 34,893.

---

[1]Reported in 39 N. W. (2d) 183.
[2]Appeal dismissed by U. S. Supreme Court March 13, 1950.

*William D. Gunn*, for appellants.

*C. Donald Peterson, Morley, Cant, Taylor & Haverstock*, and *A. Lyman Beardsley*, for respondent.

*J. Albert Woll, Herbert S. Thatcher*, and *James A. Glenn* filed a brief as *amici curiae* on behalf of American Federation of Labor.

KNUTSON, JUSTICE.

This case comes here on appeal from a judgment entered pursuant to the findings and order of the district court of Hennepin county enjoining defendants from engaging in a strike for the purpose of committing or threatening to commit certain unfair labor practices.

Defendant Carpet, Linoleum and Resilient Floor Decorators' Union, Local No. 596, AFL, is a labor organization in the city of Minneapolis whose membership is composed of men and women working generally in the cutting and laying of floor coverings in Minneapolis and St. Paul. The labor organization will be referred to hereinafter as the union. The individually named defendants are members of that union and are either officers thereof or employes of plaintiff.

The material facts are not seriously in dispute. The Dayton Company operates a large department store in Minneapolis, employing many people in its various departments. It operates under what might be called an open shop, neither denying employes the right to

belong to whatever union they may choose nor demanding or encouraging employes to belong to any union. Whether the employes wish to belong to a union or not is left entirely up to them without any interference by the company.

In connection with the sale of floor coverings, drapes, other window shades, and household furnishings of a similar nature, the company operates a workshop in which the cutting, fitting, and sewing of such furnishings are done to meet the requirements of the particular sale. The method of operation is substantially as follows: A prospective customer first contacts a salesman, who assists in selecting the material desired. The company then ordinarily sends a man to the customer's house to measure the floor, windows, furniture, or whatever the customer wishes to have covered. A sketch is made of the floors for carpets or of the windows for drapes, showing obstructions and dimensions and giving other information that may be helpful in preparing the material. This then goes to an estimator, who determines the yardage required and estimates the cost of the finished product. The estimate then goes back to the salesman, who contacts the prospective purchaser, and, if the sale is consummated, the measuring report goes to the shop, where the carpets, drapes, furniture coverings, or whatever it may be are cut, sewed, and fashioned, ready for use. The merchandise is then taken to the customer's house, where carpets or other floor coverings are laid, drapes or curtains hung, or whatever else may be required is done.

The cutting and sewing are done in a shop entirely separate from the main store. Those working on the cutting, sewing, and laying do not come into personal contact with the persons who do the selling, estimating, or measuring as a part of their work. The persons doing the measuring and estimating at this time, as well as selling, all operate out of the main store.

For many years prior to 1947, the measuring was done largely as part-time work by men who also did cutting, sewing, laying, and estimating. Most frequently, one man would measure the floor for rugs or carpets, another would measure the windows and walls for drapes, and possibly a third would measure furniture for coverings.

The result was that frequently several men made trips to the same home for the purpose of measuring various parts of the house or furniture for a single job.

In 1947 the company determined to operate on a more efficient basis. The sales volume of the department had grown to such an extent that measuring required the full time of several employes. Accordingly, they engaged the services of three ex-service men who had taken special training in architectural drawing and designing. These three men were specially fitted for the work of measuring and preparing drafts of the rooms involved.

Practically all the employes in the floor-covering department were members of defendant union. The three men hired to do the measuring were obtained through the GI placement bureau and did not belong to any union. Upon learning that nonunion men had taken over the work of measuring, members of defendant union employed in the floor-covering department were instructed that subsequent to a stated date they were to do no work on any job on which the measuring was done by nonunion men. Thereafter, several conferences between officials of the union and the labor relations representatives of the company were held. The company refused to compel the new employes to apply for membership in the union. Representatives of the company were thereupon informed by representatives of the union that unless the measuring was done by union men no further work would be done on material required to complete jobs measured by nonunion employes. In order to avoid a complete shutdown of the department, the company commenced this suit for an injunction. An ex parte restraining order was issued. A few days later, a meeting was called of the employes who were members of the union who worked in the department involved, and they voted to go on strike. The nonunion men were given no opportunity to vote. A notice of intention to strike was served on the state labor conciliator, and copies were supplied to the labor relations representative of the company and to one of the employes of the company having some supervisory power over the workshop of the department involved. Subsequently, the names of the three nonunion

men were given to a union representative by the labor relations representative of the company, and a meeting was arranged between the nonunion men and the union official. The union representative was unsuccessful in persuading the employes to seek membership in the union. Thereafter, the case came on for hearing on an application for a temporary injunction, which was granted, and upon trial a permanent injunction was granted restraining defendants from striking in violation of statutory provisions which will be discussed hereinafter. Judgment was entered pursuant to the court's order, and this appeal followed.

In 1939, the legislature of the state of Minnesota adopted a comprehensive labor relations act (L. 1939, c. 440, now M. S. A. c. 179, as amended). The objects which the legislature sought to accomplish are stated in the title to this act, as follows: "An act relating to the avoidance and settlement of labor disputes and the promotion of industrial peace, * * *." Among other things, the act provides for a "cooling-off period," during which an effort can be made to settle a dispute before calling a strike. § 179.06. This section provides for service of a notice upon the opposite parties in the event of a dispute and a short waiting period, during which an effort can be made, with the help of the labor conciliator if necessary, to settle the dispute peaceably. Thereafter, a notice of strike may be given if efforts to settle the dispute are unsuccessful.[3]

---

[3]"Subdivision 1. When any employee, employees, or representative of employees, or labor organization shall desire to negotiate a collective bargaining agreement, or make any change in any existing agreement, or shall desire any changes in the rates of pay, rules or working conditions in any place of employment, it shall give written notice to the employer of its demand, which notice shall follow the employer if the place of employment is changed, and it shall thereupon be the duty of the employer and the representative of employee or labor organization to endeavor in good faith to reach an agreement respecting such demand. An employer shall give a like notice to his employees, representative, or labor organizations of any intended change in any existing agreement. If no agreement is reached at the expiration of ten days after service of such notice, any employees, representative, labor organization, or employer may give notice of intention to strike or lockout, as the case may be, but it shall be unlawful for any

92

The act reserves to each employe the right to determine for himself whether to belong to a union or not. § 179.10.[4] It gives to a

labor organization or representative to institute or aid in the conduct of a strike or for an employer to institute a lockout, unless notice of intention to strike or lockout has been served by the party intending to institute a strike or lockout upon the labor conciliator and the other parties to the labor dispute at least ten days before the strike or lockout is to become effective. Unless the strike or lockout is commenced within 90 days from the date of service of the notice upon the labor conciliator, it shall be unlawful for any of the parties to institute or aid in the conduct of a strike or lockout without serving a new notice in the manner prescribed for the service of the original notice, provided that the 90-day period may be extended by written agreement of the parties filed with the labor conciliator.

"Notice by the employer shall be signed by him or his duly authorized officer or agent; and notice by the employees shall be signed by their representative or its officers, or by the committee selected to conduct the strike. In either case the notice shall be served by delivering it to the labor conciliator in person or by sending it by registered mail addressed to him at his office. The notice shall state briefly the nature of the dispute and the demands of the party who serves it. Upon receipt of a notice, the labor conciliator shall fix a time and place for a conference with the parties to the labor dispute upon the issues involved in the dispute, and he shall then take whatever steps he deems most expedient to bring about a settlement of the dispute, including assisting in negotiating and drafting a settlement agreement. It shall be the duty of all parties to a labor dispute to respond to the summons of the labor conciliator for joint or several conferences with him and to continue in such conference until excused by the labor conciliator, not beyond the ten-day period heretofore prescribed except by mutual consent of the parties.

"Subd. 2. The labor conciliator may take jurisdiction of a labor dispute in which negotiations for settlement have failed if either party to the dispute, before a notice to strike or lockout, files a petition requesting the conciliator to act in the dispute, setting forth the issues of the dispute and the efforts to agree and the failure to reach an agreement. If the conciliator takes jurisdiction he shall then proceed as provided in subdivision 1."

[4]"Subdivision 1. Employees shall have the right of self-organization and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection; and such employees shall have the right to refrain from any and all such activities.

majority of the employes of an appropriate unit power to select a bargaining representative, and such representative thereupon becomes the exclusive bargaining representative for all employes of the unit, but it reserves to individual employes or minority groups of employes the right to present grievances to their employer in person or through representatives of their own choosing. § 179.16, subd. 1.[5]

If a controversy arises as to the representative, the act requires the state labor conciliator to step in and certify the name or names of the representatives who have been selected. § 179.16, subd. 2.[6]

---

"Subd. 2. Employers have the right to associate together for the purpose of collective bargaining."

[5]"Representatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment, provided, that any individual employee or group of employees shall have the right at any time to present grievances to their employer in person or through representatives of their own choosing."

[6]"When a question concerning the representative of employees is raised by an employee, group of employees, labor organization, or employer the labor conciliator or any person designated by him shall, at the request of any of the parties, investigate such controversy and certify to the parties in writing, the name or names of the representatives that have been designated or selected. The labor conciliator shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining and otherwise to effectuate the purpose of this chapter, the unit appropriate for the purpose of collective bargaining shall be the employer unit, craft unit, plant unit; provided, that any larger unit may be decided upon with the consent of all employers involved, and provided that when a craft exists, composed of one or more employees then such craft shall constitute a unit appropriate for the purpose of collective bargaining for such employee or employees belonging to such craft and a majority of such employees of such craft may designate a representative for such unit. Two or more units may, by voluntary consent, bargain through the same agent or agents with an employer or employers, their agent or agents. Supervisory employees shall not be considered in the selection of a bargaining agent. In any such investigation, the labor conciliator may provide for an appropriate hearing, and may take a secret ballot of employees or utilize any other suitable method to ascertain such representa-

94

Before a strike may be called, it is the duty of the employer and the representative of the employes to endeavor in good faith to reach an agreement. § 179.06.

To initiate a strike in violation of § 179.06 is declared to be an unfair labor practice by § 179.11(2) and an unlawful act by § 179.11(10). It is also an unfair labor practice to call a strike unless it has been approved by a majority vote of the voting employes in a collective bargaining unit, or for any person or labor organization to coöperate in engaging in or inducing such strike, § 179.11(8), and such act is unlawful, § 179.11(10).

█ At the time the three nonunion men were hired, the company and the union had a written contract which was still in force.[7]

Defendants contend that the trial court erred in rejecting oral evidence seeking to show that The Dayton Company had not pre-

tives, but the labor conciliator shall not certify any labor organization which is dominated, controlled, or maintained by an employer. If the labor conciliator has certified the representatives as herein provided, he shall not be required to again consider the matter for a period of one year unless it appears to him that sufficient reason exists."

[7]"May 26, 1947

"Memorandum Of Agreement between the Dayton Company, The Baker Company, Powers Dry Goods Company, Boutell Brothers Company, Minneapolis, Minnesota and the Carpet, Linoleum and Resilient Floor Decorators Union, Local No. 596, AFL.

"This memorandum of Agreement confirms the verbal understanding between the above mentioned Retail Department Stores of Minneapolis, Minnesota, who employ members of the Carpet, Linoleum and Resilient Floor Decorators Union, Local No. 596, AFL, that the said Retail Department Stores will observe and maintain conditions of employment relating to rates of pay, daily and weekly work hours of employment, and overtime rates of pay for those employees who are members of said Union, in accordance with the minimum standards existing under contract with said Union and the Floor Covering Industry of Minneapolis, Minnesota. This Memorandum of Agreement shall become effective the 26th day of May, 1947, and shall continue in full force and effect until May 1, 1948.

"Carpet, Linoleum & Resilient Floor Decorators Union Local 596, AFL
"Lloyd M. MacAloon
By Jack R. MacAloon (signed)
"By Walter R. Cramond (signed)"

viously questioned the right of the union to represent all employes in the floor-covering department and other evidence by which defendants sought to establish the rules of the union prohibiting its members from working with nonunion employes. Defendants further contend that the written agreement existing between the parties is not complete and that, inasmuch as it refers to an oral agreement, it is competent to show what the oral agreement was. As authority for this contention, defendants cite 2 Dunnell, Dig. & Supp. §§ 3378 and 3392.

The cases cited in support of the text of these sections of Dunnell do not support defendants' position. In Ruggles, Nourse, Mason & Co. v. Swanwick & Duffy, 6 Minn. 365 (526), cited under § 3378, the oral testimony was offered to show that a note had not been delivered and that there was no consideration for it. The general rules regarding the admissibility of such evidence are stated as follows (6 Minn. 370, 371 [533]):

"It may always be shown in defense to an action on a note in the hands of original parties, that it never was perfected by delivery, or that there was no consideration moving between the parties to support it. It is equally well settled, that when any contract between parties is reduced to writing, it must be proven by the writings, and cannot be varied by any previous or cotemporaneous verbal agreements or understanding. The writings in this case do not pretend to record the whole transaction. * * * The verbal testimony in no way contradicts or varies the writings; it simply furnishes the whole of the transaction of which the writings form a part and are dependent upon for their meaning and just application. * * *

"Where there is a direct reference in a writing to a verbal agreement, the latter may be proved, even though the effect of it be to add material terms and conditions to the writing."

This case is cited with approval in American Bridge Co. v. Crawford (3 Cir.) 31 F. (2d) 708, 710, 68 A. L. R. 1246, where the court said:

"* * * Where there is a direct reference in a writing not purporting to be the agreement itself, as here, the agreement may be proved though the effect of such proof is to add material terms and conditions to the contract evidenced by the writing. Ruggles, [Nourse, Mason & Co.] v. Swanwick [& Duffy], 6 Minn. 526 (Gil. 365) ; 22 Corpus Juris, p. 1290. Where a letter does not purport to be a complete contract, but merely a recitation and confirmation of an oral agreement, such oral agreement, and not the letter, constitutes the real contract between the parties, and such contract may be. shown by parol evidence. 22 Corpus Juris, p. 1132; Seitz v. Brewers' Refrigerating Machine Co., 141 U. S. 510, 517, 12 S. Ct. 46, 35 L. Ed. 837."

The written contract involved in this case is clear and unambiguous. It does not appear to be incomplete. It shows clearly on its face that it was intended to reduce to writing the understanding of the parties which had theretofore been oral. It shows exactly what the oral understanding was. Under these circumstances, oral evidence is not admissible to vary the terms of the written agreement. Lundman v. U. S. F. & G. Co. 163 Minn. 303, 204 N. W. 159; Mueller v. Barge, 54 Minn. 314, 56 N. W. 36; Cable v. Foley, 45 Minn. 421, 47 N. W. 1135; Blondel v. Le Vesconte, 41 Minn. 35, 42 N. W. 544; Walker v. Patterson, 166 Minn. 215, 208 N. W. 3, 7.

The written agreement in this case does not refer to an oral agreement or understanding that is not a part of the writing, but it expressly confirms the prior oral understanding and states what it confirms in so many words. It does not indicate that anything is omitted, and it must be presumed to have reduced to writing the entire agreement of the parties which had theretofore existed as an oral understanding. It is the agreement, not only a part of it. Neither was there reference to an oral agreement that was supplemental to the writing, as in Nelson v. McElroy, 140 Minn. 429, 168 N. W. 179, 587. The oral testimony offered in this case could be intended only for the purpose of extending to nonunion employes the agreement which by its terms covered only union employes. The court did not err in excluding such testimony.

■ The trial court found that the purpose of the strike was mainly to coerce plaintiff into encouraging the three nonunion men to join the union. The sufficiency of the evidence to sustain this finding is challenged by defendants.

It is undisputed that the three men involved did not belong to the union and did not desire to join it. They were procured, after taking special training, through the GI training representative, and not through union sources. There is evidence that employe members of the union had stated that they had been instructed not to do any cutting, sewing, laying, or other work connected with a job that was not measured by a union man. They also stated that while they liked to work for The Dayton Company they were obliged to follow union demands or they would be black-listed and fined. Jack R. MacAloon, who was one of the labor relations representatives for The Dayton Company, testified:

"* * * I told him [Walter R. Cramond, union representative] that under our agreement between us and the union that there was no compulsory clause, that these men did not have to join the union, and that it would be illegal for the Dayton Company to advise these men to join the union, and we did not intend to do that, and he told me at that time if we did not force these men in to the union we would have no linoleum or carpet laying done, and he informed me that he had met with the employees of the Dayton Company and advised them that they would not be allowed to lay any carpet or linoleum until these measure men got in to the union."

There was other testimony of a similar nature. It would serve no useful purpose to quote it here. The credibility of the testimony is attacked by defendants, but the determination of credibility was for the trial court to pass upon. The evidence amply sustains this finding of the trial court.

■ The strike notice, which consists of a letter to the state labor conciliator, is very indefinite. It gives no specific reason for a strike, but states only that:

"Collective bargaining relationship has existed for several years between the above named employer and the Union. During this period and until very recently the employer has recognized the jurisdiction of the Union and has employed Journeymen Measuremen, at the Unions [*sic*] established wage scale. Recently, the employer engaged persons not Journeymen Measuremen to do part of such work, and has failed to compensate such persons, at the Union rate of pay."

The court found that the notice did not state the real reasons for the strike and was not issued in good faith. While the notice states that The Dayton Company was not compensating its nonunion employes according to union rates of pay, the evidence shows conclusively that the union had no knowledge of the rate of pay received by nonunion employes until after the notice was issued. It was not issued according to § 179.06. The nonunion men were given no chance to vote, as required by § 179.11(8). Taken together with the other testimony, the court was justified in finding as it did. The finding is supported by the evidence.

■ The court found that defendants have threatened to commit a violation of §§ 179.06 and 179.11(2) in calling a strike without complying with § 179.06. It is conceded by defendants that the prerequisites to calling a strike under § 179.06 have not been complied with. Defendants contend that no notice to the employer was necessary, for the reason that they are not asking to negotiate an agreement or changes in an existing agreement, or rates of pay or working conditions, but are simply seeking to enforce an oral agreement which they already had. These contentions have been answered adversely to defendants by the court's findings. The answer is to be found in the question itself. What was the purpose of the strike? Obviously, there is only one answer, namely, to compel the employer to discharge the nonunion men or to compel them to join the union. In view of the fact that the union did not have a closed-shop agreement with the employer, it would constitute an unfair labor practice for the employer to do so. To bring about such agreement, if

the union wished to negotiate for that purpose, it was necessary to comply with § 179.06. A strike called to compel such acts without compliance with the statute would be an unfair labor practice and unlawful. Consequently, it could be enjoined. The court properly so held.

■ The court found that defendants have threatened to and will commit violations of § 179.12(3) unless restrained. This section relates solely to unfair labor practices by employers. It does not apply to acts of employes or labor unions. Whether acts by employes or labor organizations seeking to compel an employer to violate § 179.12(3) may be enjoined, we need not determine; nor do we find it necessary to determine whether M. S. A. c. 185 prohibits the issuance of an injunction to restrain such acts.

■ In 1947, by c. 486, our legislature saw fit to supplement our labor relations act by adding, among other provisions, § 179.42.[8] The trial court found that defendants have threatened to and will violate this section unless restrained. With commendable frankness, counsel for defendants admit that if the trial court's findings, mentioned above, are approved there has been a violation of this section and that the decision on this point should be affirmed if this section is constitutional. Specifically, defendants contend that this section violates Minn. Const. art. 1, §§ 2 and 3, and U. S. Const. Amends. XIII and XIV. The most important question on this appeal relates to the constitutionality of this act.

In determining the constitutionality of this section of our act, we must be guided by certain fundamental rules.

---

[8] "It is an unlawful act and an unfair labor practice for any person or organization to combine with another, to cause loss or injury to an employer, to refuse to handle or work on particular goods or equipment or perform services for an employer, or to withhold patronage, or to induce, or to attempt to induce, another to withhold patronage or other business intercourse, for the purpose of inducing or coercing such employer to persuade or otherwise encourage or discourage his employees to join or to refrain from joining any labor union or organization or for the purpose of coercing such employer's employees to join or refrain from joining any labor union organization."

(a) The courts are not concerned with the wisdom of this type of legislation. The judicial function is to determine whether our legislature has transgressed the fundamental law of our state or nation and has deprived its citizens of any of the rights guaranteed to them by the constitution.[9]

(b) In construing the constitution of the United States, the Supreme Court of the United States is the final arbiter. Its decisions are binding on the state courts. State v. Weyerhauser, 72 Minn. 519, 75 N. W. 718; City of Waseca v. Braun, 206 Minn. 154, 288 N. W. 229; Dahl v. Collette, 202 Minn. 544, 279 N. W. 561; Glover v. Minneapolis Building Trades Council, 215 Minn. 533, 10 N. W. (2d) 481, 147 A. L. R. 1071; Coons v. Journeymen Barbers, etc., Union, 222 Minn. 100, 23 N. W. (2d) 345; State v. Continental Oil Co. 218 Minn. 123, 15 N. W. (2d) 542; 11 Am. Jur., Constitutional Law, § 104; 16 C. J. S., Constitutional Law, § 93.

(c) Our interpretation of our own constitution is final. Reed v. Bjornson, 191 Minn. 254, 253 N. W. 102. But where our statutes are substantially the same as federal statutes, decisions of the United States Supreme Court will be followed. Christgau v. Woodlawn Cemetery Assn. 208 Minn. 263, 293 N. W. 619; State v. Industrial Tool & Die Works, Inc. 220 Minn. 591, 21 N. W. (2d) 31.

[9]"The wisdom or lack of wisdom of a state statute or of a provision in a state constitution is not a matter for the courts. The people, through their representatives in the Legislature and through their vote for an amendment to their constitution, have the right to commit folly if they please, provided it is not prohibited by the Federal Constitution or antagonistic to Federal statutes authoritatively enacted concerning the matter involved. 'The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands.' Dissenting opinion of Justice Brandeis in Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. ed. 349, 16 A. L. R. 196, supra." A. F. L. v. Watson (D. C.) 60 F. Supp. 1010, 1016. See, also, Lincoln Fed. Labor Union v. N. W. Iron & Metal Co. 149 Neb. 507, 31 N. W. (2d) 477; Carpenters & Joiners Union, etc., v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. ed. 1143.

(d)   Every presumption is invoked in favor of the constitutionality of an act of the legislature, and the courts should not declare it unconstitutional except when satisfied, after careful consideration, that it conflicts with some provision of the state or federal constitutions.   State ex rel. Hildebrandt v. Fitzgerald, 117 Minn. 192, 134 N. W. 728; Reed v. Bjornson, *supra.*

(e)   If the state may enact a law under the federal constitution, it may do so under similar provisions of its own constitution.  The state provision was not intended to be more restrictive than that of the federal constitution.  State v. Northwest Airlines, Inc. 213 Minn. 395, 7 N. W. (2d) 691.

Probably in no field of human endeavor has the struggle for equality or supremacy been more bitter than in the field of labor relations.  In order to curb the unrestrained and often unfair activities of one of the opposing forces or the other, legislative bodies have from time to time enacted laws seeking to protect those who would otherwise be at a disadvantage.  Sometimes these laws have been unsatisfactory to labor and at other times to employers. As the court so aptly remarked in State v. Whitaker, 228 N. C. 352, 361, 45 S. E. (2d) 860, 866:

"Until recently, the struggle between management and labor has been demonstrably one-sided with Anglo-American law favoring the side possessing 'the heaviest artillery.' "

To be able to devise a system of law satisfactory to both labor and employers, within the framework of which each would fairly endeavor to settle their disputes by peaceful collective bargaining, is "a consummation devoutly to be wished."  In this struggle, probably the most controversial issue has involved the right of employers to exclude employes who belong to a union, or the opposite right of a union to insist that all employes be members of the union. The enactment of laws prohibiting discrimination against employes because of membership in a union by contract or otherwise, commonly known as "yellow dog contracts," became commonplace long ago.  To begin with, they were held to be unconstitutional.

Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. ed. 436, 13 Ann. Cas. 764, which we followed in State ex rel. Smith v. Daniels, 118 Minn. 155, 136 N. W. 584; Coppage v. Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. ed. 441, L. R. A. 1915C, 960. But the later cases hold such laws constitutional. N. L. R. B. v. Jones & Laughlin Steel Corp. 301 U. S. 1, 57 S. Ct. 615, 81 L. ed. 893, 108 A. L. R. 1352; Phelps Dodge Corp. v. N. L. R. B. 313 U. S. 177, 61 S. Ct. 845, 85 L. ed. 1271, 133 A. L. R. 1217.

Many states have now passed laws or adopted constitutional provisions prohibiting contracts in which nonunion employes are discriminated against. Such contracts are commonly referred to as closed-shop contracts or union-shop contracts. Sixteen states[10] have adopted either statutes or constitutional amendments to that effect, and such laws have been proposed in several of the other states. The constitutionality of such acts has lately been upheld by the courts of many of such states, as well as by the United States Supreme Court.

While the precise question here is not whether a state may enact laws barring closed-shop or union-shop contracts, the same considerations are involved in determining the constitutionality of such acts as in determining whether our state may constitutionally prohibit discrimination against nonunion employes, absent the closed-shop or union-shop contract, which we recognize as valid if entered into according to our law. § 179.12(3).[11] Consequently, cases pass-

---

[10]Ariz. Sess. Laws 1947, c. 81; Ark. Const. Amend. No. 34, November 7, 1944, and Acts of Ark. 1947, Act 101; Del. Laws 1947, c. 196, § 30; Fla. Const. Decl. of Rights, § 12, as amended November 7, 1944; Ga. Laws 1947, No. 140; Iowa Laws 1947, c. 296; La. Gen. Stat. § 4381.2 (Dart 1939); Md. Ann. Code Gen. Laws, art. 100, § 65 (1939); Neb. Const. Amend. § 13 (1946); Nev. Comp. Laws, § 10473 (1929); N. C. Sess. Laws 1947, c. 328, § 2; N. D. Laws 1947, c. 243; S. D. Const. art. 6, § 2, as amended November 1946, and Laws 1947, c. 92; Tenn. Public Acts 1947, c. 36; Texas Laws 1947, c. 74; Va. Acts of Assembly 1947, c. 2.

[11]"It shall be an unfair labor practice for an employer:

\* \* \* \* \*

ing upon the constitutionality of law prohibiting closed or union shops are important in passing upon the law now under attack.

In 1946, Nebraska adopted an amendment to its constitution providing that no person shall be denied an opportunity to obtain or retain employment because he is not a member of a labor organization. To enforce this policy, employers are forbidden to enter into contracts or agreements excluding persons from employment because they are or are not members of a union.[12] In Lincoln Fed. Labor Union v. N. W. Iron & Metal Co. 149 Neb. 507, 31 N. W. (2d) 477, suit was brought for a declaratory judgment seeking an interpretation of this amendment declaring it to be unconstitutional. It was contended that it violated the First Amendment as protected by U. S. Const. Amend. XIV, and in several other respects violated said Fourteenth Amendment. With respect to the right of free speech, press, assembly, or petition, the court said (149 Neb. 520, 31 N. W. [2d] 486):

"* * * Instead of preventing or abridging rights of speech, press, assembly, or petition, guaranteed by the First Amendment, the amendment preserves it for all employees, not only to those who join but also to those who do not join a union."

Respecting the equal protection of the laws, the Nebraska court said (149 Neb. 521, 31 N. W. [2d] 486):

"(3) To encourage or discourage membership in any labor organization by discrimination in regard to hire or tenure of employment or any terms or conditions of employment; provided, that this clause shall not apply to the provisions of collective bargaining agreements entered into voluntarily by an employer and his employees or a labor organization representing the employees as a bargaining agent, as provided by section 179.16."

[12]"No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or non-membership in a labor organization." Neb. Const. art. XV, § 13.

"* * * The amendment prohibits no one from joining a union, but undertakes to lawfully assert that neither membership nor non-membership in a union shall be a condition precedent to the right to work. It is inclusive of all employers and employees in this state. It does not deny the union member the equal protection of the law, but gives the non-union employee a protection of the law which he had not theretofore enjoyed."

North Carolina enacted a statute to accomplish substantially the same purpose. The constitutionality of this statute was upheld by the North Carolina court in State v. Whitaker, 228 N. C. 352, 368, 45 S. E. (2d) 860, 872. What the court there said applies to our act:

"We can see no merit in the appellants' proposition that Chapter 328 violates the Fourteenth Amendment by abridging the rights of free speech and assembly guaranteed by the First Amendment. * * * On the contrary, it seems to us that Chapter 328 may serve to secure the rights of free speech and assembly to all persons concerned. The statute protects the rights of workmen to organize; it further protects rights of workmen to express their individual opinions by refusing to join unions. The right of either side, or any faction of any side, to a labor controversy to assemble and publicize its own ideas remains inviolate."

Arizona adopted a constitutional amendment somewhat similar, although challenged on the grounds that it did not afford equal protection to union members. The constitutionality of the act was upheld by the Arizona supreme court in A. F. L. v. American Sash & Door Co. 67 Ariz. 20, 189 P. (2d) 912.

The North Carolina statute and the Nebraska and Arizona constitutional amendments were considered by the United States Supreme Court at the same time, and all were upheld by opinions dated January 3, 1949.[13] Rejecting the contentions that the North Carolina statute or the Nebraska constitutional provision violated

---

[13]Lincoln Fed. Labor Union v. N. W. Iron & Metal Co. and Whitaker v. North Carolina, 335 U. S. 525, 69 S. Ct. 251, 93 L. ed. —; A. F. L. v. American Sash & Door Co. 335 U. S. 538, 69 S. Ct. 258, 93 L. ed. —.

the constitutional guaranty of free speech, free assembly, and petition, the United States Supreme Court said in Lincoln Fed. Labor Union v. N. W. Iron & Metal Co. 335 U. S. 530, 69 S. Ct. 254, 93 L. ed. —:

"* * * Their contention is that these state laws indirectly infringe their constitutional rights of speech, assembly, and petition. While the basis of this contention is not entirely clear, it seems to rest on this line of reasoning: The right of unions and union members to demand that no non-union members work along with union members is 'indispensable to the right of self organization and the association of workers into unions'; without a right of union members to refuse to work with non-union members, there are 'no means of eliminating the competition of the non-union worker'; since, the reasoning continues, a 'closed shop' is indispensable to achievement of sufficient union membership to put unions and employers on a full equality for collective bargaining, a closed shop is consequently 'an indispensable concomitant' of 'the right of employees to assemble into and associate together through labor organizations * * *.' Justification for such an expansive construction of the right to speak, assemble and petition is then rested in part on appellants' assertion 'that the right to work as a non-unionist is in no way equivalent to or the parallel of the right to work as a union member; that there exists no constitutional right to work as a non-unionist on the one hand while the right to maintain employment free from discrimination because of union membership is constitutionally protected.' Cf. Wallace Corporation v. Labor Board, 323 U. S. 248, 65 S. Ct. 238, 89 L. ed. 216.

"We deem it unnecessary to elaborate the numerous reasons for our rejection of this contention of appellants. Nor need we appraise or analyze with particularity the rather startling ideas suggested to support some of the premises on which appellants' conclusions rest. There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employ-

ment all other persons who will not or can not participate in union assemblies. The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans. For where conduct affects the interests of other individuals and the general public, the legality of that conduct must be measured by whether the conduct conforms to valid law, even though the conduct is engaged in pursuant to plans of an assembly."

Respecting due process, the court said (335 U. S. 533, 69 S. Ct. 255, 93 L. ed. —) :

"It is contended that these state laws deprive appellants of their liberty without due process of law in violation of the Fourteenth Amendment. Appellants argue that the laws are specifically designed to deprive all persons within the two states of 'liberty' (1) to refuse to hire or retain any person in employment because he is or is not a union member, and (2) to make a contract or agreement to engage in such employment discrimination against union or non-union members.

"Much of appellants' argument here seeks to establish that due process of law is denied employees and union men by that part of these state laws that forbids them to make contracts with the employer obligating him to refuse to hire or retain non-union workers. But that part of these laws does no more than provide a method to aid enforcement of the heart of the laws, namely, their command that employers must not discriminate against either union or non-union members because they are such. If the states have constitutional power to ban such discrimination by law, they also have power to ban contracts which if performed would bring about the prohibited discrimination. Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 570, 571, 31 S. Ct. 259, 263, 55 L. ed. 328, 339, 340."

Finally, the court concludes (335 U. S. 537, 69 S. Ct. 257, 93 L. ed. —) :

. "* * * Claiming that the Federal Constitution itself affords protection for union members against discrimination, they nevertheless assert that the same Constitution forbids a state from providing the same protection for non-union members. Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers."

Florida has a constitutional provision which apparently prohibits a closed shop. In A. F. L. v. Watson (D. C.) 60 F. Supp. 1010, plaintiff brought suit to enjoin its enforcement, claiming that it contradicted several provisions of the federal constitution. The federal district court for Florida granted an injunction and thereafter caused a three-judge court to assemble to reconsider the matter. The amendment was upheld by the three-judge court, and the injunction was dissolved. The court said (60 F. Supp. 1017) :

"* * * So long as the right to organize into a union and to bargain collectively is not abridged, there is no denial of freedom of speech, press, assembly, and petition."

The Supreme Court of the United States refused finally to pass upon this constitutional amendment until it had been construed by the Florida supreme court. A. F. L. v. Watson, 327 U. S. 582, 66 S. Ct. 761, 90 L. ed. 873.

In International Union v. Wisconsin E. R. Board, 250 Wis. 550, 27 N. W. (2d) 875, 28 N. W. (2d) 254, members of the union, in order to bring pressure upon the employer, evolved the plan of having the union call special meetings at frequent intervals during working hours. The members of the union would thereupon leave their work and attend such meetings. The effect of it was to interfere with production. The Wisconsin board ordered the members of the union to cease and desist from such acts, which were declared to be unfair labor practices. In considering this order, the Wisconsin supreme court held that such action on the part of members of the union was in effect a strike and that it constituted unfair

labor practices under Wisconsin St. 1947.[14] On certiorari to the United States Supreme Court, the Wisconsin court was upheld. Int'l Union, U. A. W. A., v. Wisconsin E. R. Board, 336 U. S. 245, 69 S. Ct. 516, 93 L. ed. —. Among other things, the union contended that the Wisconsin statute violated U. S. Const. Amend. XIV. In rejecting these contentions, the United States Supreme Court said (336 U. S. 251, 69 S. Ct. 520, 93 L. ed. —) :

"It is further contended that the statute as applied invades rights of free speech and public assemblage guaranteed by the Fourteenth Amendment. We recently considered a similar contention in connection with other state action concerning labor relations. Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., and Whitaker v. North Carolina, 335 U. S. 525, 69 S. Ct. 251, and American Federation of Labor v. American Sash & Door Co., 335 U. S. 538, 69 S. Ct. 258. For reasons there stated, these contentions are without merit."

In Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 724, 62 S. Ct. 807, 808, 86 L. ed. 1143, 1146, *supra,* the court said:

"The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the

[14]"Sec. 111.06(2)  It shall be an unfair labor practice for an employe individually or in concert with others:

"(a) To coerce or intimidate an employe in the enjoyment of his legal rights, * * * or injure the * * * property of such employe * * *.

      *   *   *   *   *

"(e) To co-operate in engaging in, [or] promoting * * * any * * * overt [act] concomitant of a strike unless a majority in a collective bargaining unit of the employes of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike.

      *   *   *   *   *

"(h) * * * to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike."

employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both."

In Wisconsin E. R. Board v. Algoma Plywood & Veneer Co. 252 Wis. 549, 32 N. W. (2d) 417, defendant was a manufacturing concern employing approximately 650 production workers. The union involved was designated as the bargaining agent by a majority of the employes in an election conducted by the National Labor Relations Board. In a contract entered into between the employer and the union in 1943, the following provision was inserted upon the recommendation of the federal conciliator pursuant to an alleged policy of the War Labor Board (252 Wis. 552, 32 N. W. [2d] 418):

"All employees who, on the date of the signing of this agreement, are members of the union in good standing in accordance with the constitution and by-laws of the union, and those employees who may thereafter become members shall, during the life of the agreement as a condition of employment, remain members of the union in good standing."

It was inserted in subsequent contracts to and including one signed in 1946. One of defendant's employes, who began to work in 1945 steadily but had been employed from time to time prior to that time, refused to maintain his membership in the union. He was discharged as a result. Upon these facts, the Wisconsin board ordered the company to cease encouraging membership in the union by any discrimination with respect to hire or tenure of its employes or by requiring as a condition of employment that any employe become or remain a member of the union unless and until the employes had approved such provision by referendum under Wisconsin St. § 111.06(1)(c). The company was required to reinstate the employe and pay him what he would have earned during the period from his discharge to his reinstatement, less earnings he had made during such period. The circuit court of Wisconsin, on appeal, affirmed the board's decision, except that it held that it would be

unfair to require the employer to compensate the employe on account of the fact that the provision in the contract had been inserted upon the demand of the War Labor Board. The Wisconsin supreme court affirmed the decision of the circuit court, except that they reinstated the provision requiring back pay. The Wisconsin statute, § 111.06(1)(c)1, provides:

"(1) It shall be an unfair labor practice for an employer * * *;

"(c) 1. To encourage * * * membership in any labor organization, * * * by discrimination in regard to hiring, tenure or other terms or conditions of employment; provided, that an employer shall not be prohibited from entering into an all-union agreement with the representatives of his employes in a collective bargaining unit, where at least two thirds of such employes voting * * * shall have voted affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the board."

Certiorari to the Supreme Court of the United States was granted, and the decision of the Wisconsin court was upheld. Algoma Plywood & Veneer Co. v. Wisconsin E. R. Board, 336 U. S. 301, 69 S. Ct. 584, 93 L. ed. —. The following statement of the United States Supreme Court is pertinent (336 U. S. 305, 69 S. Ct. 587, 93 L. ed. —):

"The term 'unfair labor practice' is not a term of art having an independent significance which transcends its statutory definition. *The States are free* (apart from pre-emption by Congress) *to characterize any wrong of any kind by an employer to an employee, whether statutorily created or known to the common law, as an 'unfair labor practice.' "* (Italics supplied.)

Defendants rely heavily on Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093, and Glover v. Minneapolis Building Trades Council, 215 Minn. 533, 10 N. W. (2d) 481, 147 A. L. R. 1071. These cases are not strictly in point, in that they involve the right to picket rather than the right to strike. However, insofar as the constitutional prohibitions against injunctions to restrain are con-

cerned, much the same arguments have been used against both. It is now recognized that peaceful picketing to accomplish a lawful purpose is an exercise of the right of free speech. Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093; Carlson v. California, 310 U. S. 106, 60 S. Ct. 746, 84 L. ed. 1104; Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. ed. 1143; but picketing cannot be used to compel an employer to coerce his employes to join a union contrary to existing law. Hotel & Restaurant Employees' Int'l Alliance v. Wisconsin E. R. Board, 236 Wis. 329, 294 N. W. 632, 295 N. W. 634 (affirmed, 315 U. S. 437, 62 S. Ct. 706, 86 L. ed. 946); R. H. White Co. v. Murphy, 310 Mass. 510, 38 N. E. (2d) 685; 26 Minn. L. Rev. 895.

This question has recently been determined in Giboney v. Empire Storage & Ice Co. 336 U. S. 490, 69 S. Ct. 684, 93 L. ed. —. That case involved the right of the Missouri court to enjoin picketing which had for its purpose an object declared by Missouri law to be unlawful. Thornhill v. Alabama and Carlson v. California, *supra,* and other cases are distinguished. With respect to the state's power to enjoin picketing as against the contention that to do so violated the constitutional right of free speech, the court said (336 U. S. 504, 69 S. Ct. 691, 93 L. ed. —):

"* * * it is plain that the basic issue is whether Missouri or a labor union has paramount constitutional power to regulate and govern the manner in which certain trade practices shall be carried on in Kansas City, Missouri. Missouri has by statute regulated trade one way. The appellant union members have adopted a program to regulate it another way. The state has provided for enforcement of its statutory rule by imposing civil and criminal sanctions. The union has provided for enforcement of its rule by sanctions against union members who cross picket lines. See, Associated Press v. United States, 326 U. S. 1, 19, 65 S. Ct. 1416, 1424, 89 L. ed. 2013; Fashion Guild v. Trade Comm'n, *supra,* 312 U. S. 457, at 465, 61 S. Ct. 703, at 706, 85 L. ed. 949, at 953; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 242, 20 S. Ct. 96, 107, 44 L. ed. 136,

148. We hold that the state's power to govern in this field is paramount, and that nothing in the constitutional guaranties of speech or press compels a state to apply or not to apply its anti-trade-restraint law to groups of workers, businessmen or others."

The rule of these cases is recognized in Glover v. Minneapolis Building Trades Council, *supra,* where we said (215 Minn. 539, 10 N. W. [2d] 484):

"Cases holding that ·picketing to compel an employer to commit an unfair labor practice may be enjoined are not in point. The state labor relations acts make violations thereof unlawful and subject to restraint by injunction. The reason for such decisions is that picketing will not be permitted to compel another to commit a violation of law."

There is no constitutional reason why a state cannot provide laws for enjoining a strike which has for its purpose a plan to compel or coerce an employer to violate the law any more than there is for enjoining picketing which has the same plan for its purpose.

If the states have the constitutional right to completely forbid a closed-shop contract, there should be no constitutional obstacle to a law such as ours, which prohibits discrimination against nonunion employes, in the absence of an agreement requiring all employes of a unit to belong to a union. That there has been no violation of the constitutional guaranty of free speech in the case now before us is obvious. The employer's labor relations representative even arranged a meeting between the nonunion men and the representative of the labor union. Persuasion on the part of the union's representative was ineffective, and the employes involved chose to exercise their legal right to refrain from joining the union. That there has been no deprivation of the right of assembly or the right to petition seems equally obvious. We therefore hold that § 179.42, insofar as the acts enjoined in this case are concerned, does not violate Minn. Const. art. 1, § 3, or U. S. Const. Amend. XIV.

■ Defendants next contend that § 179.42 violates U. S. Const. Amend. XIII, and Minn. Const. art. 1, § 2. In support of this con-

tention, defendants confuse the right to strike—[15] with the right freely to determine for whom an individual desires to work. In other words, they argue that to deprive a person of the right to strike compels him to work against his will and that it therefore constitutes involuntary servitude.

The right to strike is not synonymous with the right to quit a job and work elsewhere. We believe it is obvious that there can be no question concerning involuntary servitude so far as defendant union and its officers who are not employes of plaintiff are concerned. A consideration of the question of involuntary servitude can relate only to those defendants who might be affected by having to work alongside nonunion men if they choose to remain in the employ of plaintiff.[16]

Section 179.01, subd. 8, defines a strike thus:

" 'Strike' means the temporary stoppage of work by the concerted action of two or more employees as a result of a labor dispute."

In Hodges v. United States, 203 U. S. 1, 16, 27 S. Ct. 6, 8, 51 L. ed. 65, 69, involuntary servitude is defined thus:

"The Thirteenth Amendment reads:

"Sec. 1.  Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

\* \* \* \* \*

---

[15]or the other concomitants of a strike, such as refusal to handle or work on goods or perform services for an employer for the purpose of inducing or coercing him to persuade or otherwise encourage or discourage his employes in joining or refraining from joining a labor union or organization or for the purpose of coercing such employer's employes to join or refrain from joining a labor union or organization, which is the action forbidden by our statute and has all the attributes of a strike and will be considered as such in this discussion—

[16]See, Teller, *Strikes and the Baseless Complaints of Involuntary Servitude,* as part of his treatise on *Focal Problems in American Labor Law,* 28 Va. L. Rev. 754.

"The meaning of this is as clear as language can make it. The things denounced are slavery and involuntary servitude, and Congress is given power to enforce that denunciation. All understand by these terms *a condition of enforced compulsory service* of one to another. * * *

"A reference to the definitions in the dictionaries of words whose meaning is so thoroughly understood by all seems an affectation, yet in Webster 'slavery' is defined as 'the state of entire subjection of one person to the will of another.' Even the secondary meaning given recognizes the fact of subjection, as 'one who has lost the power of resistance; one who surrenders himself to any power whatever; as a slave to passion, to lust, to strong drink, to ambition,' and 'servitude' is by the same authority declared to be 'the state of voluntary or compulsory subjection to a master.' " (Italics supplied.)

The principal distinction between the conception of a strike and the right of an individual to work for whom he chooses is that in a strike the employe does not sever his relationship with his employer, but merely suspends his services for the purpose of putting pressure upon the employer, hoping thereby to induce him to accede to the demands of the employe. As said in State v. Personett, 114 Kan. 680, 687, 220 P. 520, 524:

"* * * The man who goes out on a strike does not profess to quit his employment. He still lays claim to his position and asserts a right to go back and take it at more advantageous terms."

See, also, Jeffery-Dewitt Insulator Co. v. N. L. R. B. (4 Cir.) 91 F. (2d) 134, 112 A. L. R. 948.

This distinction is recognized both by our statute (§ 179.46)[17]

---

[17]"Nothing in this Act [§§ 179.40 to 179.47] shall be construed as requiring any person to work or perform services against his will for any other person, nor to prohibit a strike, picketing or bannering which is otherwise lawful under the statutes and laws of this state; nothing in this Act shall be construed to apply to the refusal by an employee to enter upon the premises of an employer other than his own employer when the employees of such other employer are engaged in a strike which is not an

and the court's injunction.[18]

That the courts will not compel an individual to work for an employer against his will is pointed out in Arthur v. Oakes (7 Cir.) 63 F. 310, 25 L. R. A. 41, and N. L. R. B. v. Mackay R. & T. Co. 304 U. S. 333, 58 S. Ct. 904, 82 L. ed. 1381. The courts even go so far as to hold that a person whose services are unique, such as singers, actors, and musicians, will not be compelled to work for an employer against his wishes. All that the courts have been willing to do in cases of this kind is to enjoin them from working for someone else during the term of the contract. Arthur v. Oakes, *supra.*

In Int'l Union, U. A. W. A., v. Wisconsin E. R. Board, 336 U. S. 259, 69 S. Ct. 524, 93 L. ed. —, the court said:

"* * * The right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right' and which, as the Court has pointed out, was recognized as such in its decisions long before it was given protection by the National Labor Relations Act. Labor Board v. Jones & Laughlin, 301 U. S. 1, 33, 57 S. Ct. 615, 622, 81 L. ed. 893, 909, 108 A. L. R. 1352.

"As to the right to strike, however, this Court, quoting the language of § 13, has said, 306 U. S. 240, 256, 59 S. Ct. 490, 496, 83 L. ed. 627, 635, 123 A. L. R. 599, 'But this recognition of *"the right to strike"* *plainly contemplates a lawful strike,*—the exercise of the unques-

---

unfair labor practice, but does not include any person subject to the Federal Railway Labor Act as amended from time to time."

[18]"(c) The foregoing order shall be subject to the provisions that no individual member of said defendant union is directed or required to work against his or her will, nor is any member of said Union denied the right of quitting his or her employment, and that clause (a) hereof shall not apply in the event of a collective bargaining agreement entered into voluntarily by the plaintiff and the defendant union if it shall hereafter represent the employees of the plaintiff, including the three non-union men herein involved, as a bargaining agent as provided by Section 179.16 of the Minnesota Labor Relations Act."

tioned right to quit work,' and it did not operate to legalize the sit-down strike, which state law made illegal and state authorities punished. Labor Board v. Fansteel Corp., 306 U. S. 240, 59 S. Ct. 490, 83 L. ed. 627, 123 A. L. R. 599. Nor, for example, did it make legal a strike that ran afoul of federal law, Southern S. S. Co. v. Labor Board, 316 U. S. 31, 62 S. Ct. 886, 86 L. ed. 1246; nor one in violation of a contract made pursuant thereto, Labor Board v. Sands Mfg. Co., 306 U. S. 332, 59 S. Ct. 508, 83 L. ed. 682; nor one creating a national emergency, United States v. United Mine Workers, 330 U. S. 258, 67 S. Ct. 677, 91 L. ed. 884." (Italics supplied.)

See, also, Algoma Plywood & Veneer Co. v. Wisconsin E. R. Board, 336 U. S. 301, 69 S. Ct. 584, 93 L. ed. —, *supra.*

With respect to a violation of the Thirteenth Amendment, the United States Supreme Court, in Int'l Union, U. A. W. A., v. Wisconsin E. R. Board, said (336 U. S. 251, 69 S. Ct. 520, 93 L. ed. —) :

"The Union contends that the statute as thus applied violates the Thirteenth Amendment in that it imposes a form of compulsory service or involuntary servitude. However, nothing in the statute or the order makes it a crime to abandon work individually (compare Pollock v. Williams, 322 U. S. 4, 64 S. Ct. 792, 88 L. ed. 1095) or collectively. Nor does either undertake to prohibit or restrict any employee from leaving the service of the employer, either for reason or without reason, either with or without notice. The facts afford no foundation for the contention that any action of the State has the purpose or effect of imposing any form of involuntary servitude."

The same is true of our statute and the court's injunction.

Insofar as the United States constitution is concerned, we are bound by the above decisions of the Supreme Court of the United States. The term "involuntary servitude," as used in Minn. Const. art. 1, § 2, carries with it the same meaning as "involuntary servitude" in U. S. Const. Amend. XIII. Our decision construing our constitution should be consistent with the construction placed on a

similar provision of the United States constitution in the foregoing cases by the Supreme Court of the United States.

We therefore hold that § 179.42 does not violate Minn. Const. art. 1, § 2, or U. S. Const. Amend. XIII.

Affirmed.

Frank T. Gallagher, Justice (concurring specially).

I concur in the result.

Thomas Gallagher, Justice (dissenting).

I am of the opinion that defendants should have been permitted to introduce testimony as to the agreement between the union and plaintiff.

The writing of May 26, 1947, is a "memorandum of Agreement confirm[ing] the verbal understanding" between various retail department stores of Minneapolis employing members of Local No. 596, whereunder they agreed to "observe and maintain conditions of employment relating [only] to *rates of pay, daily and weekly work hours of employment,* and *overtime rates of pay* for those employees who are members of said Union, in accordance with the *minimum standards existing under contract* with said Union and the Floor Covering Industry of Minneapolis, Minnesota."

It is obvious that such memorandum did not extend to or cover all of the alleged agreement which defendants contended existed between the parties. By its language, it could not be construed as excluding agreements, whether oral or otherwise, between plaintiff and defendants relating to defendants' right to represent all employes in plaintiff's floor-covering department, or with reference to restrictions and rules which bound defendants' members and which, they asserted, plaintiff had recognized but subsequently violated.

Accordingly, defendants were within the recognized rules of evidence when they sought to introduce testimony tending to establish such agreements between defendants and plaintiff with respect to matters directly in issue in these proceedings. It would follow that the trial court erred in excluding such evidence on the ground that it varied the memorandum of May 26, 1947. See, Vaughan v. Mc-

Carthy, 63 Minn. 221, 65 N. W. 249; Harding v. Texoleum Co. 154 Minn. 55, 191 N. W. 394; Cargill Comm. Co. v. Swartwood, 159 Minn. 1, 198 N. W. 536; Osterberg v. Section 30 Development Co. 160 Minn. 497, 200 N. W. 738.

■ There is also substantial doubt in my mind that the evidence is sufficient to sustain the trial court's finding that defendant union was recognized by plaintiff as the bargaining agent for only those employes who were members of the union and had recognized the union only to that extent.

At the time the memorandum of May 26 was prepared and for many years prior thereto, all employes had been members of the union. Article IV of plaintiff's exhibit B-1 provides:

"* * * Under no circumstances nor at any time during the period of this agreement shall the Union furnish Union members to Employers who are not signatories to this agreement except to qualify such employer for the purpose of becoming a party to this agreement."

It is not contradicted that from the time the union was organized all of plaintiff's employes had been members thereof. It is not conceivable that this condition existed without the knowledge and active coöperation of plaintiff. Subsequent to the memorandum of May 26, 1947, plaintiff sent one of its employes to the union to arrange for its approval before he commenced work. All new employes in this department were referred to the union steward. The collective bargaining relationship had existed between plaintiff and the union for many years. This evidence, together with the trial court's refusal to admit testimony to establish that the union represented all employes of plaintiff's floor-covering department, in my opinion, might compel a contrary finding on this issue if a new trial were granted.

MR. JUSTICE PETERSON took no part in the decision of this case.