214 So.2d 34 (1968)
The PINELLAS COUNTY CLASSROOM TEACHERS ASSOCIATION, Inc., a Florida Corporation, and Fred Cekau, Its President, and Mrs. Elsie Chamburs, Its Secretary, Appellants,
v.
The BOARD OF PUBLIC INSTRUCTION OF PINELLAS COUNTY, Florida, Appellee.
No. 36773.
Supreme Court of Florida.
September 18, 1968.
Cotten, Shivers, Gwynn & Daniel, William F. Daniel, Tallahassee, and Edwin I. Ford, Largo, for appellants.
Edward A. Turville, St. Petersburg, for appellee.
THORNAL, Justice.
We take jurisdiction of a direct appeal from a final decree of a circuit court which construes controlling provisions of *35 the Florida and United States Constitutions.
Our ultimate decision is concluded by the power of a chancellor to enjoin a strike by public school teachers.
On January 11, 1967, the appellant, Pinellas County Classroom Teachers' Association, Inc., entered into a Professional Affairs Agreement with the appellee, Board of Public Instruction of Pinellas County. In this opinion we shall refer to the Agreement by that designation. The appellant association shall be called C.T.A., and the Board shall be so called. By the Agreement the Board recognized C.T.A. as the organization with which it would negotiate concerning salaries and working conditions of teachers. Both parties accepted "their individual obligations to assure the uninterrupted operation of the School System." By its terms it remained effective until January 15, 1968. Numerous Conferences were held pursuant to the agreement. In April, 1967, new contracts were sent to all teachers employed on an annual contract basis and to those moving into a continuing contract or tenure status. Testimony was that not a single contract was returned to the Board with any statement of reservations. As a result, before the beginning of the 1967-68 school term, the Board had received executed contracts from every teacher who was returning to the system either under tenure or on an annual contract basis. In the former category there were 2,699, and in the latter, 1,073. Copies of the two types of contracts were attached to the complaint and a list of the names of all teachers who signed them was placed in evidence. Additionally, there were 252 teachers under so-called binder agreements. These were new teachers whose certification from the State had not yet been received. In this status they were not members of C.T.A. when suit was filed. However, each of these had previously received and accepted a formal "notification of appointment" which the chancellor correctly held constituted an enforceable agreement.
Each annual contract recited a base salary and then expressly provided that the Board agrees to employ the teacher "at a salary not less than that shown above, and in accordance with the officially adopted salary schedule." Each continuing contract provided that the teacher was employed on a continuing basis "at an annual salary schedule heretofore or hereafter adopted by the County Board." The so-called binder agreement stated that "The signatures on this offer will indicate that this agreement is binding on the part of the County Board and you." The binder provided also that "The salary scale for the coming school year recognizing certification, rank, and acceptable experience, will be observed." This was accepted by the 252 new teachers.
Normally, under state regulations the budget of the Board should have been submitted to the State Superintendent of Public Instruction by August 3, 1967. However, due to legislative delays occasioned by teacher salary problems at the time, the Board could not adopt its 1967-68 salary schedule until August 10, 1967. The Chancellor held that the delay was excusable and we agree.
At the August 10, 1967, Board Meeting the vice-president of C.T.A. read a prepared statement to the effect that the salary schedule was unacceptable despite increases in all categories. On August 15, 1967, the president of C.T.A. delivered to the County Superintendent a written communication to the effect that the teachers could not begin the performance of services until "such things as salaries and general working conditions could be agreed and incorporated in their respective contracts."
With schools scheduled for opening on August 16, 1967, and the announced intention of the teachers to stay away from the classrooms, the Board sought and obtained a temporary injunction to prohibit the strike. The temporary injunction was granted on August 15, 1967, and was made *36 permanent on August 31, 1967, after two days of extensive hearings.
By the injunctive decree the Chancellor announced: "That the Pinellas County Classroom Teachers Association, Inc., and each of its members who hold an appointment with the Board of Public Instruction of Pinellas County, Florida, be and they are hereby permanently enjoined from striking, failing to report to work, stopping work, or failing to perform all or part of their duties of employment for the purpose of inducing, influencing or coercing a change in compensation or conditions of employment."
The Chancellor supplemented the formal decree with an explanatory opinion which was expressly incorporated into the decree. It is this decree which we now review on appeal.
Although appellants claim that the teachers were only negotiating and had never finalized contracts, this record is abundantly clear that all three classes of teachers had binding contracts with the Board. While the stipulated salaries were stated to be the minimums or those stated in the schedule to be adopted by the Board, the fact remains that all elements of a contract were present and agreed upon in writing. The Chancellor correctly held that all parties bound by his decree had valid and enforceable contracts to teach in the Pinellas County schools for the year 1967-68. beginning August 16, 1967.
Appellants raise various objections to the pleadings. The complaint was properly brought against the appellant Association in order to bind its members by the decree. The Association represented the teachers who had acted in concert through C.T.A. as their bargaining agency. The members of C.T.A. were the only ones bound by the decree. Non-member teachers had not threatened to strike. Relief against them was neither sought, nor obtained.
The complaint adequately alleged bases for declaratory relief. Under Fla. R.Civ.P. 1.130(a), 30 F.S.A., it was sufficient to attach copies of each of the several contracts and allege that they were signed respectively by the three categories of teachers.
Appellants have come directly here, claiming that the trial judge passed directly on the validity of Fla. Stat. § 839.221 (1967), F.S.A. This statute, in effect, prohibits governmental officers and employees from participating in strikes against the government. It states that "no person shall accept or hold any * * * employment in the service of the state, of any county or of any municipality * *" who participates in any strike against the governmental employer. The statute guarantees the right to bargain as a member of a union or labor organization but precludes the right to strike against government.
The Chancellor did not really pass on the validity of the statute. He recognized the statute and then announced that even if it were inapplicable, "a person holding a government position has no right to strike without clear and direct legislative authority to do so." He based his ultimate judgment on the general powers of equity to prevent the breakdown of an essential aspect of government because of an unauthorized work stoppage by its employees. In following this course the Chancellor relied upon sound concepts and precedents. Miami Water Works Local No. 654 v. City of Miami, 157 Fla. 445, 26 So.2d 194, 165 A.L.R. 967 (1946); Dade County v. Amalgamated Association of Street Electric Railway & Motor Coach Employees of America, 157 So.2d 176 (3d Dist.Ct.App. Fla. 1963); Norwalk Teachers' Ass'n v. Board of Education of City of Norwalk, 138 Conn. 269, 83 A.2d 482, 31 A.L.R.2d 1133 (1951). In referring to strikes by public employees the decision last cited credits the late President Franklin D. Roosevelt with the statement that "Such action, looking toward the paralysis of *37 Government by those who have sworn to support it, is unthinkable and intolerable." We share this view so clearly announced by one, whom history records as a political patron saint of the modern labor movement. The Chancellor wisely made clear that his injunction could not preclude an unconditional termination of employment, nor could it be employed to impinge on freedom of speech, assembly or association short of the advocacy of a strike against the government.
The Chancellor did, however, construe the so-called "involuntary servitude" provisions of the state and federal Constitutions. Fla.Dec. of Rights § 19, F.S.A., provides in part: "Neither slavery nor involuntary servitude * * * shall ever be allowed in this state." Substantially identical proscriptions are announced by U.S.Const. amend XIII.
Appellants insist that the injunction requires involuntary servitude as proscribed by the foregoing provisions. The Chancellor specifically held that it does not. He clearly stated that involuntary servitude is not involved simply because all he was doing was prohibiting a strike by a group of teachers who had been duly appointed and who had not terminated their employment. The Chancellor did not force the teachers to work. He merely offered them alternatives, which were: (1) to work and thereby comply with their contracts; (2) resign in accordance with the terms of their contracts; or, (3) resign in violation of their contracts and subject themselves to the provisions of Fla. Stat. § 231.36 (1965), F.S.A., which would make them ineligible for employment in the school system for a period of one year from the date of such violation.
We are not here confronted by an arbitrary mandate to compel performance of personal service against the will of the employee. These people were simply told that they had contracted with the government and that they could, if they wished, terminate the contract legally or illegally, and suffer the results thereof. They could not, however, strike against the government and retain the benefits of their contract positions.
Appellants place great reliance on Henderson v. Coleman, 150 Fla. 185, 7 So.2d 117 (1942). This decision does not control the instant case. Henderson merely held that one man cannot be forced to serve another against his will. It then held that where "there was no contractual relation" between a union and a truck operator, the union members could not be required to work for the operator. In the case before us there was the "Professional Affairs Agreement" between the Board and C.T.A. Even more importantly, perhaps, the appellants were told that they could resign or breach their contracts, but they could not strike and bargain for a return to work while retaining their teacher status under contract terms. This is a significant aspect of the instant matter which should be carefully noted in employing this opinion in any future situation.
A "strike is ordinarily thought of as the physical act of employees leaving their workbenches or office desks and departing from their place of employment, but not including in such departure a severance of the employer-employee relationship." Forkosch, A Treatise on Labor Law (1965). The teachers here were not quitting their jobs or severing the employer-employee relationship. They were free to do that before and after the injunction. What they were really attempting to do here was to exert pressure on the School Board by refusing to go to work, but at the same time laying claim to their positions and asserting the right to go back to work on terms more acceptable to them. This, indeed, was a typical strike. Dayton Co. v. Carpet, etc. Union, Local No. 596, AFL, 229 Minn. 87, 39 N.W.2d 183, cert. denied 339 U.S. 906, 70 S.Ct. 570, 94 L.Ed. 1334 (1949); State ex rel. Frazier v. Coleman, 156 Fla. 413, 23 So.2d 477 (1945).
*38 The conclusion is almost inescapable that the action announced by members of appellant C.T.A. was a strike by any standard. It was a strike against the government which all authorities agree cannot be tolerated in the absence of expressed consent by the government. Local 1526, International Longshoremen's Association, A.F.L.-C.I.O., v. Broward County Port Authority, 183 So.2d 257 (4th Dist.Ct.App. Fla. 1966); Board of Education of the City of New York v. Shanker, 54 Misc.2d 941, 283 N.Y.S.2d 548 (1967); Amell v. United States, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966); Miami Water Works Local No. 654 v. City of Miami, supra; Norwalk Teachers' Association v. Board of Education of City of Norwalk, supra; Pruzan v. Board of Education of City of New York, 25 Misc.2d 945, 209 N.Y.S.2d 966 (1960), aff'd. 12 A.D.2d 923, 215 N.Y.S.2d 718 (1961), aff'd. 9 N.Y.2d 793, 215 N.Y.S.2d 506, 175 N.E.2d 164 (1961).
We affirm the holding of the Chancellor to the effect that in the absence of specific statutory authority an employee of government has no right to strike, as herein defined, in order to coerce a change in compensation or conditions of employment. To this end, we agree with the Chancellor when he stated:
"To allow such action would permit the breakdown of governmental functions, would sanction the control of a governmental function for private gain; and further, to allow such action is the same as saying that governmental employees may deny the authority of government through its duly elected representatives. To permit this is to take the first step toward anarchy."
The decree is affirmed.
CALDWELL, C.J., THOMAS, ROBERTS, DREW and ADAMS (Retired), JJ., concur.
ERVIN, J., concurs in judgment with opinion
ERVIN, Justice (concurring in the judgment):
I concur in the judgment of affirmance. I believe that the described contracts which were executed by teachers on a tenure basis or an annual contract basis, or on a binder agreement basis bound them to teach during the ensuing school year. Such contracts rendered them ineligible to resign or refuse to teach, for salary reasons, during that term. Had they not executed such contracts containing the language described in the foregoing opinion, they would not have been bound in any way and would have been under no legal or moral obligation to teach during the ensuing school year.