**URBAN COUNCIL ON MOBILITY,**
Petitioner, Respondent,

v.

**MINNESOTA DEPARTMENT OF NATURAL RESOURCES,**
Respondent-Below.

**Appeal of ASSOCIATED FAMILIES.**

Nos. 50636, 50685.

Supreme Court of Minnesota.

Jan. 25, 1980.

Dayton, Herman, Graham & Getts and Charles K. Dayton, Minneapolis, for petitioner-respondent.

Luther M. Stalland, Minneapolis, for respondent-below.

Stephen J. Snyder, Minneapolis, for amicus curiae.

Paul H. Hauge and Bradley Smith, Eagen, for City of Eagan.

SCOTT, Justice.

This appeal involves an order of the Commissioner of Natural Resources, dated December 15, 1978, which denied the application of the Minnesota Department of Transportation (DOT) for a permit to construct a portion of Interstate Freeway I–35–E by bridging Blackhawk Lake in Eagan, Minnesota, and, instead, provided that the DOT be granted a permit to construct the required freeway segment around the east side of the lake. The district court reversed the commissioner's decision and ordered that the DOT be allowed to construct a part of I–35–E on a bridge located across Blackhawk Lake. We reverse the district court and reinstate the decision of the commissioner.

Interstate 35, as planned, runs from Laredo, Texas, to Duluth, Minnesota. Just south of the Twin Cities, in Burnsville, Minnesota, the freeway divides, with I–35–W proceeding through Minneapolis and I–35–E traveling through St. Paul. The two routes come together north of the Twin Cities in Forest Lake, Minnesota. The interstate is completed from the southern Iowa border to Duluth, with two exceptions: (1) a five-mile segment of I–35–E in St. Paul (not involved in this case), and (2) a 13-mile length of I–35–E running from its southernmost point in Burnsville to Highway 110 in Mendota Heights, which includes the crossing of Blackhawk Lake in Eagan.

The 13-mile Burnsville to Mendota Heights portion of I–35–E was planned in late fall, 1958. Three alternate routes were then proposed—all three crossed Blackhawk Lake. A location hearing was held in Burnsville on August 24, 1959, at which time the alternative routes were presented. One of the proposed alternatives was selected and approved by the Bureau of Public Roads (now Federal Highway Administration [FHWA]) in January 1960.

In August, 1971, after the holding of a public design hearing, the DOT received approval from the FHWA for the design of a portion of the subject freeway. However, when requested in December 1971 to approve the design of the remaining part, which includes Blackhawk Lake, the FHWA recommended that an Environmental Impact Statement (EIS) be prepared on the entire 13-mile segment to comply with the National Environmental Policy Act of 1969.

The DOT began work on the EIS in September 1973. Since the alternative of going around the lake was not recognized by the DOT until the late fall of 1975, the initial reports compiled for the EIS did not include reference to that possibility. However, the draft EIS, completed in June 1976, and the final EIS issued in May 1977 do contain analyses of both alternatives. The final EIS prepared by the DOT selected the alternative of bridging Blackhawk Lake. The EIS states:

> The selection of either alternative * * * would be satisfactory from an engineering standpoint and either would be consistent with the regional (Metropolitan Council) land use desires for the area. Both could be designed to provide a safe freeway and both would cost about the same.
>
> [Bridging the lake] was selected because of the strong local preference for it. That preference is reflected in the long history of land use planning and development that has been predicated on [that alternative].
>
> The local desires thus outweigh the negative environmental impacts of crossing Blackhawk Lake.

In May 1978 the DOT, pursuant to Minn. Stat. § 105.42 (1978), applied to the Department of Natural Resources (DNR) for a permit to cross Blackhawk Lake. On June 8 and 15, 1978, a notice of hearing was published in the Dakota County Tribune. Various parties moved to intervene, and were allowed to do so by the hearing examiner. The Cities of Eagan and Burnsville, the Urban Council on Mobility (UCOM) and

the Dakota County Development Association (DCDA) intervened on the side of the DOT, urging the DNR to grant the requested permit. Associated Families (AF), a partnership of seven families which owns approximately 80 acres of land on the north side of the lake, and the Minnesota Pollution Control Agency (PCA) intervened in opposition to the issuance of the permit. The DNR staff also appeared in opposition to the DOT's proposed action.

A three-week hearing, generating about 3,000 pages of transcript, was held in the months of June and July, 1978. The essential question litigated was whether I–35–E should cross Blackhawk Lake by way of a bridge (designated alternative A–1) or whether the freeway should be routed around the east end of the lake (designated alternative A–2). Each alternative is about three miles long and the traffic volume under either alternative is anticipated to be, in the year 2000, about 71,000 vehicles per day.

In an extensive 33-page report dated November 9, 1978, the hearing examiner compared routes A–1 and A–2, and concluded that A–2 is the preferable alternative. Specifically, with respect to A–2, the report states that "a feasible and prudent alternative is available which does not have material detrimental aspects." Consistent with his findings and conclusions, the hearing examiner recommended that the Commissioner of Natural Resources deny the DOT's requested permit.

On December 15, 1978, the commissioner adopted as his own the findings and conclusions of the hearing examiner, with the following exception:

> Contrary to the hearing examiner's finding * * * that the environmental effects which would be caused by construction of the freeway along route A–2 are not "material," I specifically find such effects to be material as the effects always will be when associated with a project of such scope. However, said effects as a whole, will be significantly reduced by construction along route A–2 than along route A–1, and no other more

feasible and prudent route has been shown to exist.

Consequently, the commissioner denied the DOT permission to route I–35–E across Blackhawk Lake and ordered that a permit would be granted for the construction of route A–2, subject to DNR approval of final plans and specifications.[1]

UCOM petitioned for judicial review of the agency order in accordance with Minn. Stat. § 15.0424 (1978), and AF intervened in the proceeding. By a decision issued September 13, 1979, the district court reversed the commissioner's order and ruled that the DOT was entitled to a permit to construct a bridge across Blackhawk Lake. The court reasoned that (1) the commissioner's decision was not supported by substantial evidence; and (2) the permit for route A–2 was improperly granted[2] because no permit application had been made for A–2 and an EIS in final form on route A–2 had not been presented. In ruling on the substantial evidence question, the court relied heavily upon the delay which would be encountered should route A–2 be selected over A–1. AF subsequently moved for a new trial on the ground that newly discovered evidence shows that the time difference between the A–1 and A–2 alternatives is only about two months. AF's motion was denied.

AF now appeals to this court from the trial court's order reversing the commissioner and the order denying a new trial. The following have been granted permission by this court to appear as amici curiae in support of AF's position: the Sierra Club; Izaak Walton League of America, Incorporated—Minnesota Division; Minnesota Public Interest Research Group (MPIRG); Minnesota Environmental Control Citizen Association (MECCA); Clear Air, Clean Water—Unlimited; Friends of the Boundary Waters Wilderness; Audubon Chapter of Minneapolis; St. Paul Audubon Society; and Minnesota River Valley Audubon Club. The City of Eagan was granted the opportunity to appear as an amicus on the side of UCOM. Also, the DNR did not appeal from the trial court's rulings and thus did not appear before this court.[3]

This case presents the following issues for our review:

(1) Is the commissioner's decision supported by substantial evidence?

(2) Did the commissioner err as a matter of law in ordering that a permit would be granted for the A–2 route?

(3) Did the commissioner and/or his staff act improperly during the decision-making process?

■ When reviewing a claim of insufficient evidentiary support for an agency's determination, this court takes a "fresh look" at the record and need not pay any special deference to the trial court's decision on the same matter. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 823–24 (Minn.1977). As we stated in *Herbst*:

[I]t is our function to make an independent examination of an administrative agency's record and decision and arrive at our own conclusions as to the propriety of

---

1. The order stated, relative to the A–2 alternative:

    A permit will be granted for the freeway route which passes around the east end of the lake as more precisely described in the hearing record where it is identified as the A–2 route. It is a condition of any such permit that MnDOT must obtain approval from DNR of the final plans and specifications, which shall show that reasonable effort has been made to minimize its impact on the lake and the park.

2. As is pointed out in n. 1, *supra*, the commissioner's order of December 15, 1978, did not actually grant such a permit. Rather, it stated that "[a] permit will be granted" for the A–2 route.

3. It should be noted that UCOM alludes to various factors, such as the DNR's failure to appeal, and claims that this case is moot because the commissioner has changed his mind, now preferring A–1 over A–2. On the basis of the record before us, however, we are unconvinced that the commissioner has had a change of heart. Indeed, UCOM's contention to the contrary is merely speculation which cannot be properly relied upon by this court in deciding the instant case. Therefore, UCOM's motion to dismiss this appeal on mootness grounds is hereby denied.

that determination without according any special deference to the same review conducted by the trial court. 256 N.W.2d 824.

■ The standard applied by this court in making its "independent examination" is commonly referred to as the "substantial evidence test": if the record, when considered in its entirety, contains substantial evidence supporting the administrative decision, this court must uphold the agency ruling. *E. g., Quinn Distributing Co., Inc. v. Quast Transfer, Inc.,* 288 Minn. 442, 181 N.W.2d 696 (1970); Minn.Stat. § 15.0425(e) (1978). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herbst, supra,* 256 N.W.2d 825. Further, absent a manifest injustice, inferences drawn from the evidence by the agency must be accepted by a reviewing court even though it appears contrary inferences would be better supported. *Id.*

■ The DOT's application for a permit is made pursuant to Minn.Stat. § 105.42 (1978), which requires permission from the Commissioner of Natural Resources prior to construction that in any way changes a public water such as Blackhawk Lake. Minn.Stat. § 105.45 (1978) provides, in pertinent part, that:

If the commissioner concludes that the plans of the applicant are *reasonable, practical, and will adequately protect public safety and promote the public welfare, he shall grant the permit,* and, if that be in issue, fix the control levels of public waters accordingly. In all other cases the commissioner shall reject the application or he may require such modification of the plan as he deems proper to protect the public interest. In all permit applications the applicant has the burden of proving that the proposed project is reasonable, practical, and will adequately protect public safety and promote the public welfare.[4]

(Emphasis added.)

Since the environment is involved, however, the commissioner must comply with the Minnesota Environmental Rights Act (MERA), Minn.Stat. c. 116B (1978), and the Minnesota Environmental Policy Act (MEPA), Minn.Stat. § 116D (1978), which constitute the real source of controversy in this case. Minn.Stat. § 116B.09, subd. 2 (1978), states:

In any such administrative, licensing, or other similar proceedings, the agency shall consider the alleged impairment, pollution, or destruction of the air, water, land, or other natural resources located within the state and no conduct shall be authorized or approved which does, or is likely to have such effect so long as there is a *feasible and prudent alternative* consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land, and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

(Emphasis added.) Similarly, Minn.Stat. § 116D.04, subd. 6 (1978), provides that:

No state action significantly affecting the quality of the environment shall be allowed, nor shall any permit for natural resources management and development be granted, where such action or permit

---

4. DNR policy regarding the issuance of public water permits is set out in its rules, 6 MCAR §§ 1.5020–1.5026. Rule 1.5023A states the agency's position regarding structures in public waters:

It is the policy of the Department to discourage the waterward occupation of the beds of public waters by offshore navigational facilities, retaining walls, and other structures in order to preserve the natural character of public waters and their shorelands, * * *.

Specific DNR policy regarding bridge construction is found in Rule 1.5025A, which reads as follows:

It is the policy of the Department to allow crossings of public waters, including the construction of water intake and sewer outfall structures in public waters, *only when less detrimental alternatives are unavailable or unreasonable,* and where such facilities adequately protect public health, safety, and welfare.

(Emphasis added.)

has caused or is likely to cause pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, so long as there is a *feasible and prudent alternative* consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

(Emphasis added.) The methodology for applying the environmental legislation is set out in Minn.Stat. § 116B.04 (1978):

[W]henever the plaintiff shall have made a prima facie showing that the conduct of the defendant *has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources* located within the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an *affirmative defense, that there is no feasible and prudent alternative* and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its air, water, land and other natural re-

sources from pollution, impairment, or destruction. Economic considerations alone shall not constitute a defense hereunder.

(Emphasis added.) Here, there is no doubt that the DOT's proposed action is likely to cause impairment of a natural resource. *See, County of Freeborn v. Bryson (Bryson I)*, 297 Minn. 218, 228, 210 N.W.2d 290, 297 (1973).[5] Thus, the issue becomes whether the evidence properly establishes that a "feasible and prudent alternative" is available.

After a careful and thorough examination of the record, we are satisfied that substantial evidence supports the commissioner's determination that a "feasible and prudent alternative" exists to the action proposed by the DOT. There is abundant evidence demonstrating that A–2 will have less of an adverse impact on water quality, wildlife habitat, aesthetics, and area quietude. We therefore conclude that the record contains such evidence as a reasonable mind could rely upon to determine that A–2 is the superior route.

In reaching a contrary decision, the district court emphasized the delay which would be incurred if route A–2 were selected over A–1. A representative of the DOT, Merritt Linzie, testified that the delay in construction of the Blackhawk Lake segment of I–35–E would amount to nine to 24 months.[6] As noted above, however, AF

5. "Natural resources" is defined in Minn.Stat. § 116B.02, subd. 4 (1978), as including, but not limited to:

[A]ll mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources. Scenic and esthetic resources shall also be considered natural resources when owned by any governmental unit or agency.

Minn.Stat. § 116B.02, subd. 5 (1978), provides that:

"Pollution, impairment or destruction" is any conduct by any person which violates, or is likely to violate, any environmental quality standard, limitation, regulation, rule, order, license, stipulation agreement, or permit of the state or any instrumentality, agency, or political subdivision thereof which was issued prior to the date the alleged violation occurred or is likely to occur *or any conduct which materially adversely affects or is likely to materially adversely affect the environment*; provided that "pollution, impairment

or destruction" shall not include conduct which violates, or is likely to violate, any such standard, limitation, regulation, rules, order, license, stipulation agreement or permit solely because of the introduction of an odor into the air.

(Emphasis added.) The above definition sections apply to both Chapters 116B and 116D. Minn.Stat. §§ 116B.02, subd. 1 (1978); 116D.04, subd. 5(b, c) (1978).

In *Bryson I*, this court applied these statutory definitions and acknowledged that construction of a highway through a natural marsh would materially adversely affect a natural resource. 297 Minn. 228, 210 N.W.2d 297. Construction of a bridge across a lake will most certainly have a similar adverse impact on natural resources.

6. Linzie stated that it would take four to six months for the design of A–2 to be brought to the level of detail now enjoyed by A–1. The remaining time is necessary so that an amend-

claims that it has new evidence showing that the delay would be insignificant, about two months. Even assuming, *arguendò*, that a substantial delay would result if A–2 were chosen, the district court's reliance upon this consideration is misplaced. Non-environmental interests are generally not given great weight in ascertaining whether a "feasible and prudent alternative" is available. This principle was discussed by the court in *County of Freeborn v. Bryson (Bryson II)*, 309 Minn. 178, 186, 243 N.W.2d 316, 320 (1976), as follows:

> Turning then to the second issue presented by this appeal, we note that the affirmative defense under the Act is apparently derived from Federal environmental law. Section 4(f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C.A. § 1653(f), provides that the Secretary of Transportation shall not approve acquisition of public parkland for construction of Federal-aid highways unless "there is no feasible and prudent alternative." In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), respondents argued that "the requirement that there be no other 'prudent' route requires the Secretary to engage in a wide-ranging balancing of competing interests." 401 U.S. 411, 91 S.Ct. 821, 28 L.Ed.2d 150. The United States Supreme Court emphatically rejected this contention:
>
> > "But no such wide-ranging endeavor was intended. It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. * * *
> >
> > "Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes

indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost of community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems. 401 U.S. 411, 91 S.Ct. 821, 28 L.Ed.2d 151."

The purpose and language of the Federal statute and our Act are substantially the same. Therefore, we follow the decision of the United States Supreme Court and give our statute a similar construction. The *Dayton Co. v. Carpet, Linoleum, Etc., Union*, 229 Minn. 87, 100, 39 N.W.2d 183, 191 (1949).

▮ The delay occasioned by the selection of A–2 does not reach extraordinary dimension. *See, Louisiana Environmental Society, Inc., v. Coleman*, 537 F.2d 79, 85 (5th Cir. 1976) (ten year delay found not to be "unique problem" within the meaning of the *Overton Park* decision). Thus, this element cannot play a major role in determining whether A–2 is a "feasible and prudent alternative." Nor does the frustration of city planning alleged in this case[7] constitute a "truly unusual factor." As this court stated in *Herbst v. City of White Bear Lake*, 311 Minn. 146, 155, 247 N.W.2d 901, 906 (1976), "[t]he fact that the city has expended a substantial amount of money in preparation for an environmentally damaging project does not require that project's construction."

In summary, the record contains substantial evidence to support the commissioner's decision and order of December 15, 1978.

---

ment to the EIS can be prepared, which will satisfy the FHWA. Linzie was unsure as to what the FHWA will require relative to the EIS. His minimum time estimate was based on the FHWA only requiring amendment of the final EIS to reflect that the A–2 alternative had been selected instead of the A–1 route.

7. As a result of selecting A–2, some trunk sewer sanitary lines and manholes, which were constructed on the assumption A–1 would be built, would have to be relocated, at an expense of about $129,500.

Accordingly, we uphold the commissioner's determination that A–2 constitutes a "feasible and prudent alternative" to the DOT's proposed action.

█ 2. The district court concluded that the commissioner erred as a matter of law in granting a permit to construct A–2 because a final EIS had not been prepared on that route and no permit application had been requested for the A–2 alternative. Given the circumstances of this case, we cannot agree with the court's determination. The import of Minn.Stat. § 116D.04, subd. 1 (1978), is that an EIS shall be prepared for any major governmental or private action so that an informed decision can be made on whether the project should proceed. In this case, the EIS contains an extensive analysis of both routes which, of course, includes a detailed discussion of the A–2 alternative. As a result, the environmental information contemplated by § 116D.04 is found in the existing EIS, and thus the statutory EIS requirement is satisfied.

Further, under Minn.Stat. § 105.45 (1978) the commissioner is expressly granted the authority to "require such modification of the [proposed] plan as he deems proper to protect the public interest." We believe the commissioner has acted in accordance with the above statute by ordering that a permit will be granted to construct A–2. This conclusion is supported by the practical considerations involved in this case. It is clear that A–1 and A–2 are the only viable options available for completing I–35–E in the Blackhawk Lake area. The entire administrative process was devoted to whether A–1 or A–2 was the best alternative. The commissioner concluded that A–2 was superior and accordingly ordered that a permit would be issued for that route. In so doing, the commissioner has saved the time and expense which would otherwise result from a new application process. Based on the foregoing, the commissioner acted properly in ordering that a permit would be granted for A–2.

█ 3. UCOM next asserts that the appearance of the DNR agency staff at the hearing as an adversary constitutes a denial of due process. This claim ignores a fundamental concept of administrative agency practice. The nature of the administrative process is such that a division of the agency may properly act as an advocate where the ultimate decision is made by the agency head. So long as the decision-maker remains unbiased, the combination of functions by an agency does not conflict with the dictates of due process.[8] *See, generally,* 2 Davis, *Administrative Law Treatise,* c. 13 (1958). Here, the record does not show that the commissioner's decision was improperly influenced by the agency's participation at the hearing. Thus, UCOM's contention is without merit.

UCOM also argues that the commissioner's review of the record in this case was inadequate and thus his ruling was merely a "rubber stamp" of the hearing examiner's report. To support this claim, UCOM was allowed to inquire of the commissioner, by way of interrogatories, regarding the decision-making process. The answers to these interrogatories demonstrate that the commissioner made an informed decision, after adequate consideration of the voluminous evidence submitted at the hearing. He spent about ten hours personally studying the record. The commissioner reviewed the entire transcript "reading verbatim those areas of testimony which [he] felt were of substance or were in dispute," and examined every exhibit submitted at the hearing. In addition, he received a four-or-five-hour briefing from his staff, which consisted of a review of the evidence and the arguments made by the parties. For the above reasons, we believe the commissioner acted properly in rendering his decision in this case.

8. It should be noted that this court has recently encouraged state agencies, who are responsible for the issuance of permits, to take an active role in proceedings where environmental interests are involved. *See, No Power Line v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 326, 332 (Minn.1977).

Finally, we appreciate that the question of whether I–35–E should be built over Blackhawk Lake or around the east side of the lake has undoubtedly generated a great deal of frustration for all those affected. The construction of the freeway in the Blackhawk Lake area, whose need has never really been doubted, has been in the planning stages for over twenty years. It has become the subject of substantial controversy and litigation, culminating in this decision by the commissioner after his thorough review of the voluminous evidence submitted at the hearing regarding the two alternatives. The commissioner's December 15, 1978, ruling, which we hereby uphold, will finally resolve the matter in favor of the A–2 alternative, and we trust this will allow all concerned to proceed in the construction of the critical highway segment along the chosen route.

The trial court's decision which ordered the commissioner to issue a permit for alternative A–1 is reversed [9] and the commissioner's decision of December 15, 1978, is reinstated in its entirety. Accordingly, we revoke any action of the commissioner taken after the issuance of the district court's order which is inconsistent with the decision reached herein and deny all motions pending on this matter.

Reversed with instructions.

---

9. The district court decision concluded:

THEREFORE, the Commissioner of the DNR's Order denying the DOT's permit application to route I–35–E across Blackhawk Lake in the City of Eagan is reversed. The Commissioner is hereby Ordered to grant the permit request made by the dot to construct I–35–E along alignment A–1 which includes building a bridge across Blackhawk Lake.