**In the Matter of the Contested Case of RICHVIEW NURSING HOME, Fair Oaks Health Care Center, Regency Manor Nursing Home, Relators,**

v.

**MINNESOTA DEPARTMENT OF PUBLIC WELFARE, Respondent.**

No. C1–84–64.

Court of Appeals of Minnesota.

July 24, 1984.

Review Denied Oct. 31, 1984.

John M. Broeker, Samuel D. Orbovich, Broeker, Hartfeldt, Hedges & Grant, Bloomington, for relators.

Hubert H. Humphrey, III, Atty. Gen., Beverly Jones Heydinger, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by LANSING, P.J., and FOLEY and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Relators, four Minnesota nursing homes, seek review of a final order made by the Commissioner of Public Welfare. The order affirmed most of the costs disallowed by the Department of Public Welfare and, in effect, determined the rates for the care of the nursing homes' medical assistance patients for the years 1975 through 1980. The nursing homes contend that by not allowing the costs and offsets for "efficiencies," the rates that could be charged by the nursing homes were adversely affected. They also contend that their due process rights were violated and that DPW has applied an unpromulgated rule when it requires a nursing home to meet a burden of proof.

We affirm, with modification.

## FACTS

M.J. Hellman and Associates (the management company) was formed by Martin Hellman, its owner and chief executive officer. The management company oversees the management of Hellman's four nursing homes. The property of each of the homes is owned by a separate corporation. Hellman is the sole stockholder of each one. Each nursing home is operated by a separate Subchapter "S" corporation. Hellman is the sole stockholder of each of these also. During the period in question, each nursing home had an identical management structure and a uniform operating procedure developed by the management company.

Each of the nursing homes participates in the State's medical assistance program under contract with the Department of Public Welfare (DPW). Minnesota Rule 9510 governs the per diem rates for nurs-

ing homes providing care to welfare residents under the medical assistance program. The per diem rates for the next year are based on historical cost with adjustments for projected or known cost increases and "unidentified cost increases." The costs of the management company allowed under Rule 9510 are allocated to the four nursing homes. The prospective per diem rate is calculated by dividing the number of "adjusted patient days" for a prior year into historical costs plus known cost increases and unidentified cost increases.

Under Rule 9510, all nursing homes participating in the medical assistance program are required to submit annual cost reports, which are subject to "desk audit" by DPW auditors. DPW also conducts field audits. DPW can make adjustments based on the results of an audit. If unimplemented known cost changes exceed underprojected known cost changes, DPW claims a "pay back" and the nursing homes must refund the money.

DPW conducted desk audits for the four nursing homes for calendar years 1976, 1978, 1979, and 1980. It also conducted field audits for three of the nursing homes for 1975, 1976, and 1977, and for the fourth nursing home for 1976 and 1977. DPW adjusted the per diem rates for welfare patients based on these audits. The nursing homes appealed these rate determinations. DPW initiated a contested case proceeding under the Minnesota Administrative Procedure Act. The Commissioner issued a final order on December 13, 1983.

## ISSUES AND ANALYSIS

■ In reviewing this matter, we will defer to the Department of Public Welfare's interpretation of Rule 9510 when the language of the rule is so technical that only DPW has the experience and expertise needed to understand it, when the language is ambiguous, or when DPW's interpretation is one of long standing. *Resident v. Noot*, 305 N.W.2d 311, 312 (Minn. 1981). We will not defer to the DPW's interpretation "when the language em-

ployed or the standards delineated are clear and capable of understanding." *Id.*

1. Did DPW properly include actual resident days when calculating the rates to be paid for future services rendered by the nursing homes?

In 1976 the Minnesota legislature enacted a rate equalization law which provided, among other things, that after July 1, 1978, a nursing home would not be eligible to receive medical assistance payments unless it agreed in writing that it would not charge nonmedical assistance recipients higher rates than it charged medical assistance recipients for similar services. *Minnesota Laws 1976*, Chapter 282, § 8. DPW sent supplemental agreements incorporating the terms of the new law to all nursing homes along with the request that the nursing homes sign the agreements. The nursing homes in question did not sign. DPW sent another letter advising the nursing homes that if they did not sign, it would not make payments for medical assistance patients admitted after June 30, 1978. Hellman did not sign the agreements until July 24, 1979. However, the nursing homes admitted medical assistance residents between July 1, 1978, and July 24, 1979. The nursing homes provided the care and billed DPW, but DPW did not and has not paid the nursing homes.

On its 1978 and 1979 cost report, each nursing home included the costs of care for the patients for whom DPW has refused reimbursement. However, the nursing homes reduced their actual number of patient days by the number of patients for whom DPW had refused reimbursement. DPW refused to accept the reduction in patient days and adjusted rates accordingly.

The nursing homes contend that DPW erred when it included nonreimbursed resident days in the Rule 9510 rate calculations because the inclusion of those resident days caused a rate reduction for future services rendered. The nursing homes also contend that because DPW has not paid for the care and because the nonreimbursed resident days are included in calculating

the per diem rate for the following year, they are subject to a double penalty.

■ Minnesota Rule 9510.0190, subpart 1, defines "patient days" for the purposes of determining a per diem rate as "a day for which full and normal billings were rendered." This phrase is not ambiguous. A bill which is rendered is one which is given or submitted as for approval, consideration, or payment. Webster's Unabridged Dictionary 1530 (2nd ed. 1983). The nursing homes submitted bills to DPW and thus the nonreimbursed patient days must be included in calculating per diem rates. It is clear that Rule 9510 is designed to set a per diem rate based on the daily per patient cost of providing care. If the actual number of patient days were not included when calculating the per diem rates, the per diem rates for the following year would be artificially high. By that method, the nursing homes would be able to recover part of the cost of care which DPW refused to pay. However, the nursing homes cannot recover costs indirectly which they may not be entitled to recover directly. Whether they are entitled to be reimbursed by DPW for the care rendered to welfare patients from July 1978 to July 29, 1979 is a separate question which must be addressed in the appropriate forum.

2. Did the hearing examiner err in not considering whether DPW's refusal to pay for the disputed patient days was illegal?

■ The nursing homes contend that DPW violated their statutory and due process rights by refusing to pay them for the care they gave the medical assistance residents between July 1, 1978, and July 24, 1979. They initially raised this contention during the contested case hearing. The hearing examiner ruled that DPW's liability for the care was outside of the scope of the issues in the proceeding and therefore he did not make findings of fact, conclusions of law, or a recommendation on the issue of liability. The Commissioner agreed and added that "whether the petitioners are entitled to a contested case hearing [on this issue] is outside the scope

of the hearing and must be decided separately."

The nursing homes argued the issue of liability for cost of care in their brief. However, because the issue of liability was not considered, there is no proper record or decision for this court to review. *Local 34, State County and Municipal Emp. of Am. Federation of State, County and Municipal Emp., AFL–CIO v. County of Hennepin,* 310 Minn. 283, 288, 246 N.W.2d 41, 44 (1976). The question that the nursing homes should have addressed in their brief is whether the hearing examiner erred when he excluded the issue of liability, reasoning that under Minn.Stat. § 14.57 (1982) DPW was required to raise the issue of liability and that under the circumstances of this contested case he was without authority to require them to add new issues.

The nursing homes also should have addressed the question whether the Commissioner was correct in concluding that whether the nursing homes are entitled to a contested case hearing is also outside of the scope of the hearing. Because the nursing homes neither directly raised nor briefed these issues, we decline to consider them except to note that the nursing homes were not without remedies in the district court. *Cf., Commers v. Spartz,* 294 N.W.2d 321 (1980).

3. Did DPW properly include the salaries paid to on-site administrators within the top management compensation limitation?

Rule 9510.0340, subpart 2 limits the amount of compensation paid to top management personnel which may be included as an allowable cost in computing a nursing home's per diem rate. The nursing homes claimed the salaries of on-site administrators as allowable costs. DPW included these salaries within the top management compensation limitation and adjusted the per diem rates accordingly.

The nursing homes contend that: (1) the on-site administrators are not part of top management because they are assistant administrators and (2) DPW does not reason-

ably apply the top management compensation provision to a multi-facility/single management company.

The nursing homes' contention that the administrators are "assistant administrators" who are exempted from the top management compensation limitation is without merit. Minn.Stat. § 144A.04 subd. 5 (1982) requires that each nursing home have a *"full-time* licensed nursing home administrator ...." (Emphasis added.) This statute specifically uses the word administrator and does not provide that a nursing home may have an assistant administrator in lieu of an administrator. In this case there was only one on-site administrator licensed to practice nursing home administration at each nursing home. Each was in general administrative charge of his or her nursing home on a full-time basis. Since there was only one person at each home who could meet the requirements under Minn.Stat. § 144A.04, subd. 5, the nursing homes' contention that the administrators were merely assistant administrators for purposes of the top management compensation limitation must fail.

The nursing homes also argue that DPW's ruling is inconsistent with the special provisions for multi-home providers contained in Rule 9510.0160, subpart 3. We find no inconsistency, nor do we find any lack of clarity in the rule.

Rule 9510.0160, subpart 3 provides for the cost allocation to an individual nursing home of top management salaries for providers who operate several nursing homes. The nursing homes argue that since "administrators" are not listed among those in top management in this subpart, then their salaries are not subject to the top management compensation limitation. This argument is fallacious. Administrators are specifically made subject to the top management compensation limitation in Rule 9510.0340, subpart 2. Since each nursing home must have a full-time administrator, the administrator's salary is not subject to allocation and is properly not included in Rule 9510.0160, subpart 3. Rule 9510.0160, subpart 3 is an additional provision which allows management companies such as M.J. Hellman and Associates to allocate the top management salaries of the management company to the various nursing homes which they serve. DPW correctly included the on-site administrators' salaries within the top management compensation limitation.

Finally, we note that there was substantial evidence in view of the entire record to support the findings that the on-site administrators were, in fact, administrators of their respective facilities. Minn.Stat. § 14.69(e) (1982); *Peoples Natural Gas Co. v. Minnesota Public Utilities Comm'n,* 342 N.W.2d 348, 351 (Minn.Ct. App.1983).

4. Did DPW err when it included all of Clifford Peterson's salary as top management compensation?

Clifford Peterson was the vice president of the management company. Each nursing home claimed a share of his salary as an allowable cost on their annual reports. DPW auditors disallowed it under the top management compensation limitation since the limitation was exceeded.

The hearing examiner found that Peterson was the chief financial officer and that his financial duties took approximately 48.7 percent of his time. He found that 51.3 percent of the duties were executive in nature. The hearing examiner also found that DPW does not include salaries of comptrollers or chief financial officers in the top management compensation limitation and that DPW does not have a policy of allocating a portion of salary to top management. The hearing examiner recommended that 49 percent of Peterson's salary be treated as an allowable cost not subject to the top management limitation.

The conclusions and recommendations of the hearing examiner were reversed by the Commissioner. He held that the salary of a top management employee cannot be allocated between the duties performed as top management and other duties. He then

included Peterson's whole salary in the top management compensation limitation.

The nursing homes contend that "the mere fact that Mr. Peterson has the title of vice president is an insufficient reason to include his salary within the top management compensation limitation." The nursing homes do not dispute the findings regarding the percentage of Peterson's time spent in a large number of tasks or that he was the company's only vice president. Rather, they argue that the duties found to be executive in nature are not executive-type duties. We have carefully considered the duties designated as management duties and have concluded that they are consistent with a conclusion that the duties were executive in nature. We are persuaded by the evidence that Peterson filled the role of a vice president, a view obviously held by Martin Hellman who described Peterson's responsibilities:

> They would be almost anything and everything that I do. I view him always as an extension of myself to handle anything that I don't handle or haven't got the time to handle or can't handle.

Rule 9510.0160, subpart 3 provides that the allocated portion of compensation for "presidents or similarly titled individuals" shall be subject to the top management compensation limitation. There is no provision in this rule which states that the duties of a vice president, for example, can be further allocated between those subject to the limitation and those not subject to the limitation. If DPW began to allocate the duties of a vice president between those subject to the top management compensation limitation and those not subject to the limitation, they in effect would be improperly promulgating a new rule which they may not do. *White Bear Lake Care Center, Inc. v. Minnesota Department of Public Welfare*, 319 N.W.2d 7 (1982). We, therefore, affirm the Commissioner's decision to include Peterson's total salary within the top management compensation limitation.

5. Did DPW properly include payments for the owner's medical reimbursement plan in the top management compensation limitation?

■ One of the nursing homes adopted a plan to pay the medically-related bills of the Hellman family up to the sum of $5,000 annually for expenses not covered by Group Health. These costs were disallowed by DPW.

The nursing homes argue that the plan is a fringe benefit which is identified as a general and administrative expense under Minn.Rule 9510.0180, subpart 8. This rule just defines a fringe benefit and goes no further by itself.

Rule 9510.0160, subpart 3 provides that the "allocated portion of compensation for the ... presidents ... shall be subject to the limitation provided in part 9510.0340, subpart 2." Rule 9510.0340, subpart 2 defines compensation to include the costs of non-cash compensation such as residences and salaries. The payments made on behalf of Hellman are plainly compensation or non-cash compensation as these terms are usually defined. Thus we affirm the decision of the Commissioner to include this compensation within the top management compensation limitation.

6. Did DPW properly disallow "known cost changes" in relation to employee expense allowances?

■ In 1976, three homes claimed a known cost increase in the monthly expense allowance to be paid to some management company employees. The allowance in this case was to be paid in lieu of reimbursement for actual expenses such as mileage and lunches. DPW disallowed the projected increases.

Rule 9510.0030, subpart 3 allows known cost changes for a list of items. The rule specifically restricts adjustments to those items listed in the rule. The nursing homes assert that employee expense allowances are "[s]alary and wage changes ...." Rule 9510.0030, subpart 3(A).

We observe that the words "wage" and "salary" are used in this section of the rule rather than the broader word "compensa-

tion" which is used in other sections of the rule.

An expense allowance does not fall within the definition of salary or wage. A salary or wage is paid for the performance of a job, while an expense allowance is reimbursement for work-related expenses. The plain language of the rule supports the Commissioner's conclusion that the projected increases for expense allowances must be disallowed.

7. Did DPW properly deny the "known cost changes" for workers' compensation?

 Each nursing home requested a 28.6 percent known cost increase for workers' compensation in 1979. The nursing homes justified the increase by citing a petition by the Workers' Compensation Insurers Rating Association of Minnesota, filed with the Minnesota Department of Commerce, requesting a general rate increase of 28.6 percent. DPW disallowed the known cost increase on the ground it was speculative. In fact, no rate increases occurred in 1980 or 1981. The rates actually decreased slightly.

Known cost changes for insurance are allowed. Rule 9510.0030, subpart 3 provides the circumstances under which all known cost changes are allowed:

> Cost changes determined under this provision must be based upon facts and commitments in existence as of the original filing date of the report part 9510.0150, subpart 5, item A. If the provider cannot substantiate that such facts and commitments did exist as of the filing date, the welfare rate will be subject to adjustment * * *.

The hearing examiner found that DPW has traditionally applied this rule strictly and disallowed known cost increases which are undocumented or speculative. He concluded that under the plain language of the rule there were no "facts and commitments in existence" and that it was mere speculation that there would be an increase at all. He further concluded that such a construction was consistent with the words *"known cost changes."* We agree with the hearing examiner's reasoning and affirm the decision of the Commissioner to disallow an increase.

8. Did DPW properly deny the "known cost changes" for fuel oil and natural gas?

 On their 1979 cost reports, the nursing homes projected a known cost increase of seventy-five cents per gallon for oil, but did not document it. The desk auditor adjusted the increase to thirty-three cents per gallon, a figure which had been verified by a fellow auditor for an unrelated facility. This figure was not uniformly applied to all providers.

The hearing examiner found that since energy costs were difficult to project during this period, DPW auditors were more flexible in accepting "facts and commitments" to justify cost increases. DPW used a fifteen percent increase when there was no support for a higher rate. The thirty-three cent increase allowed the nursing homes in this case was the equivalent of a thirty-eight percent increase.

On their 1976 cost reports two nursing homes projected a twenty-three percent increase for gas. No documentation was submitted so DPW reduced the increase to fifteen percent. The Commissioner affirmed DPW's decisions.

The nursing homes contend that when DPW permits a fifteen percent increase absent documentation, they are promulgating a rule which was not adopted pursuant to the Administrative Procedure Act and therefore the fifteen percent increase is invalid under *White Bear Lake*. They further contend that their cost projection should be granted. As part of their argument, they note that DPW does not consider the filing of an application for increased rates by a utility as sufficient documentation and so argue that it is difficult to justify increases.

DPW counters that even if it had no authority to allow the fifteen percent increase the appropriate remedy would be to disallow the undocumented increases, not to authorize larger, unsubstantiated increases, for under a strict reading of Rule

9510.0030, subpart 3 the nursing homes would not be allowed a "known cost change" for fuel oil or natural gas.

We hold that the nursing homes are entitled to a fifteen percent increase for both fuel oil and gas for the periods in question. However, in the future DPW must not allow increases unless they conform with the requirements of Rule 9510.0030, subpart 3. We agree with the nursing homes that when DPW permits a fifteen percent increase without documentation they are promulgating a rule which was not adopted pursuant to the Administrative Procedures Act, but it does not follow that any increase requested by a facility absent documentation must be allowed.

In this case we will not retroactively disallow a fifteen percent increase for the nursing homes in question for such a disallowance would result in unequal treatment since all facilities during the period were allowed a fifteen percent increase. Using the same criterion of equal treatment we will not allow the thirty-three cent increase which was the equivalent of a thirty-eight percent increase. While an unrelated facility did document a thirty-three cent per gallon increase for fuel oil, the nursing homes did not offer any such documentation. To allow such an increase without the nursing homes supplying their own documentation is consistent neither with the rule nor with equal treatment.

9. Did DPW properly deny the "known cost changes" for group hospitalization?

■ On their 1976 cost reports, three nursing homes projected a known cost increase of $10 per month per employee for group hospitalization. They did not document it. Rather, the nursing homes assumed an increase because the union contracts were due to be renegotiated and Peterson had heard rumors that the unions were going to try to increase benefits. DPW disallowed the increase. The contribution actually did increase $5 per month in September of 1977.

Plainly no "facts and commitments" were in existence as of the original filing date of the report as required by Rule 9510.0030, subpart 3. Therefore, we affirm the Commissioner's decision to disallow projected cost increases for group hospitalization because they were speculative.

·10. Did DPW properly include bonuses when determining whether management salary increases should be allowed as a known cost change?

■ On their 1980 cost reports, the nursing homes claimed an $80,883 increase for salaries of management company employees. The nursing homes used the base salaries paid to the employees during 1980 to project the increase for 1981. However, some of the employees received substantial bonuses in 1980. The amount of the bonuses was included in the historical cost reports but the nursing homes did not consider the bonuses when projecting the cost increases. The bonuses for 1981 were not determined at the time the 1980 cost reports were filed. They were payable at Hellman's sole discretion.

Under Rule 9510.0030, subpart 3 known cost changes must be added to the historical cost. While there is no specific definition of historical costs in the rule, bonuses must be included as part of the historical costs because they were costs which were actually paid and thus are "historical."

The projected increases in this case were not greater than the historical salary plus the historical bonuses. DPW properly disallowed the known cost increase. There were "no facts or commitments" to support the projected known cost change because Hellman had not determined to pay the employees more than they received in 1980 (salary plus bonus) but only to pay them more than their 1980 salary exclusive of their bonuses.

The hearing examiner did modify DPW's disallowance to give the nursing homes an opportunity to show which employees, if any, received no bonuses in 1980. The Commissioner accepted this modification, and we affirm it.

11. Did DPW err when it refused to use the "efficiencies" claimed by the nursing homes to offset the payback?

■■■ A desk auditor compares actual historical costs with the prior year's projection and determines whether the projected known cost changes were implemented. If the nursing home did not spend as much as had been projected, the per diem rate for the past year is recalculated using actual costs. A payback is then requested by DPW.

The nursing homes contend that Rule 9510 may be reasonably interpreted to entitle them to offset paybacks by the amount of various cost savings and efficiencies they implemented. They cite the applicability and purpose section of the rule to support their contention.

The hearing examiner found that requiring paybacks with no offsets for efficiencies is consistent with DPW's long standing application of Rule 9510.0030, subpart 3.

Under Rule 9510.0030, subpart 3, the payback calculation is applied only to the costs projected by the nursing home itself. In effect it prevents a nursing home from benefiting from its own over projections.

The practice of requiring paybacks with no offsets for efficiencies is consistent with the plain language of the rule. The applicability and purpose section of the rule offers no basis for the nursing homes' proposition that the rule should be interpreted to allow for efficiencies. There is no mention of "efficiencies" or anything similar in the rule. If DPW did allow for offsets for efficiencies, the practice would constitute an impermissible interpretation of Rule 9510 and would in effect be an improper promulgation of a new rule. *White Bear Lake*, 319 N.W.2d at 9.

12. Did DPW properly disallow the social service consultant contract for Allen Swartz?

■■■ Allen Swartz, Hellman's son-in-law, is the administrative supervisor for the management company. During the years in question he was also under a separate contract with each nursing home to provide social service consultation. The costs claimed for the consultation alone were $2,400 per nursing home per year. DPW disallowed these fees. The Commissioner found the fees were disallowed under the reasonable cost principles of Rule 9510.0230.

Since 1975, each nursing home has had a full-time social service director and the management company has employed a social service specialist. Their salaries have been allowed by DPW on the nursing homes' cost reports.

The hearing examiner found that some of the social service directors met the requirements imposed by federal regulations. He further found that Swartz informally consulted with social service directors on social service matters during his rounds of the nursing homes, but his consultation was no different than his consultation with other nursing home directors in terms of the time he spent with them. He also found that Swartz's consultation with on-site administrators regarding the quality of the nursing homes' social service program did not include the preparation of written plans or reports. Finally, he found that all of Swartz's relevant duties were duplications of the duties assigned to or performed by the social service director or the social service specialist.

The nursing homes argue that the social service specialists and directors did not have the degree of expertise possessed by Swartz, that nothing in Rule 9510 suggests that they must compromise their services with individuals whose qualifications only meet minimal requirements, and that DPW artificially construed the "necessary and ordinary" provision of Rule 9510.0230. The nursing homes did not directly contend that there was insufficient evidence to support the hearing examiner's finding that Swartz's services were duplicative.

Rule 9510.0230 requires that for costs to be allowable for rate setting purposes:

A. They must be necessary and ordinary costs related to patient care.

B. They must be costs that prudent and cost-conscious management would pay for a given item or service.

Rule 9510.0250 is also pertinent. It provides in part:

Reasonable compensation of individuals employed in the facility is an allowable cost, provided the services are actually performed in a necessary function and the costs reported are actually incurred. To be reasonable the compensation allowance must be such an amount as would ordinarily be paid for comparable services by comparable facilities. To be necessary the function must be such that had the individual not rendered the services, the facility would have had to employ another person to perform the services.

While Swartz does possess commendable expertise, we agree that the payments were not necessary because Swartz's duties were duplicative of duties assigned to the social service specialist and the social service director and they were not ordinary because there was no evidence that other similarly situated nursing homes employ a consultant in addition to a specialist and a social service director for each nursing home.

13. Did DPW follow the proper method for calculating the private pay rate limitation?

Under Rule 9510.0130, subpart 1, a nursing home's welfare per diem rate is limited by the rate it charges private patients. The nursing homes challenge DPW's application of this limitation in three specific ways.

A. Patient day adjustments.

■ An auditor found that at one of the nursing homes there were two instances where one private patient occupied a double room with one of the beds removed and paid approximately twice the normal rate for double room occupancy. At the same time some welfare residents occupied double rooms alone due to low occupancy. In these instances one of the beds was not removed. The auditor concluded that the private residents had not received services comparable to medical assistance residents and compensated by doubling the patient days of individuals occupying double rooms. The effect was to reduce the private pay rate. The hearing examiner found that the doubling of patient days was not consistent with past practice where DPW excluded the payments made and the rates charged.

The hearing examiner concluded that the past practice of excluding the days should be followed because any other method either artifically inflates or deflates the private pay rate. The Commissioner accepted the hearing examiner's conclusions.

The nursing homes contend that the services provided to the private residents in question were the same as the services provided to medical assistance residents and thus the higher rates charged should be averaged in. The nursing homes make no specific contention that there was insufficient evidence to support the finding that DPW had a past practice of excluding patient days in similar situations.

Welfare patients were placed in double occupancy rooms alone for the convenience of the nursing home because of low occupancy. Because this service was not offered to all welfare patients and because it could be taken away at the whim of the nursing home, it is not a comparable service. We affirm both the Commissioner's decision and his method of calculation.

B. Calculation of the private pay limitation.

■ Rule 9510.0130, subpart 1 states in part, "[t]his rate limitation shall be applied when the welfare rate is anticipated to exceed the private pay rate for a comparable time period."

The nursing homes contend that the "comparable time period" should be a year because welfare rates are determined by dividing the cost for the most current fiscal year by adjusted patient days.

"Comparable time period" is not defined in the rule. DPW has historically calculated the private pay rate on a monthly basis.

It combines the rates for the months in which rates stay the same and limits the welfare rate by this "monthly weighted average" during the relevant time period. Since the phrase "comparable time period" is ambiguous and since DPW's interpretation is of long standing, we will defer to DPW's construction. *Resident v. Noot*, 305 N.W.2d at 312.

## C. Mathematical errors.

The nursing homes contend that DPW made some mathematical errors. The hearing examiner found that the nursing homes failed to meet their burden of proof on this issue. We agree.

14. Did DPW properly characterize a security system and a sprinkler system as "building improvements" rather than "equipment"?

One of the nursing homes installed a television monitor security system and an automatic sprinkler system. DPW found that they were both "major building improvements" rather than equipment for depreciation purposes. Minnesota Rule 9510.0370.

■ An improvement is "a permanent addition to or betterment of real property that enhances its capital value and that involves expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Kloster-Madsen, Inc. v. Tafi's, Inc.*, 303 Minn. 59, 63, 226 N.W.2d 603, 607 (1975). Certainly both the sprinkler system and the television monitor security system are improvements. It is more difficult to determine whether they are "major" for purposes of the rule. However, the hearing examiner determined that DPW has a long standing practice of treating items like these as major building improvements. The nursing homes did not challenge the determination. When language is ambiguous or when an agency's interpretation is one of long standing, we will defer to the agency's interpretation and do so in this case. *Resident v. Noot*, 305 N.W.2d at 312.

15. Did DPW properly treat certain equipment as capitalized?

■ Three of the nursing homes claimed the purchase cost of draperies, electrical wiring, smoke detectors, tiling, and a motor as depreciable expenses. DPW aggregated the purchases and capitalized them under Rule 9510.0420.

The hearing examiner accepted the nursing homes reasoning and rejected DPW's use of aggregation saying the mere fact that the language of this part is plural does not mean that separate purchases must be aggregated. The Commissioner accepted the hearing examiner's construction with the clarification that any *single* item exceeding the two cents per day limit should be capitalized under the rule.

The nursing homes now contend that any capitalization is contrary to Rule 9510 because nursing homes must follow generally accepted accounting principles. Rule 9510.-0420 sets forth specific criteria for determining whether equipment should be expensed or capitalized. The nursing homes' argument is without merit.

16. Did DPW properly reject applications for a waiver of the 93 percent occupancy incentive?

■ Rule 9510.0470 provides an incentive to nursing homes to maintain a high level of occupancy but allows an exception in cases of extreme hardship. Two of the nursing homes applied for the exception because of low occupancy. DPW denied the applications.

The hearing examiner found that both nursing homes were able to and did pay all of their obligations as they came due during the years for which waivers were requested. He also found that they had no substantial cash flow problems during these time periods. Further, he found that for the years in question Hellman received an average $107,000 compensation from each nursing home for each year and that his wife and daughters also received compensation. The nursing homes do not challenge these findings.

The nursing homes strenuously argue that Hellman's salary should not be considered in determining hardship and that the occupancy rates should be considered. It is not necessary to rely on Hellman's salary to conclude there was no hardship. Extreme hardship is defined to *include* a financial situation in which debt and operating obligations cannot be met. Rule 9510.0470 subpart 4(B). In this case the nursing homes paid their debts and they had no substantial cash flow problems. Since this minimum criterion was not met, occupancy is irrelevant. Thus the exception was properly denied.

17. Did DPW properly disallow a fine levied by the Department of Health?

■ One of the nursing homes was cited and fined $500 for deficiencies in operation by the Department of Health. This cost was disallowed by DPW under Rule 9510.0340, subpart 5 P(4) which provides in part that "[a]ssessments levied and collected by the Minnesota Health Department shall not be recognized as allowable costs."

The nursing homes contend that the rule is more restrictive than Minn.Stat. 256B.47 (1982) and that the rule makes an irrebuttable presumption that all assessments are unrelated to patient care and such a presumption is unconstitutional.

In this case, it is unnecessary to rely on the rule to disallow the costs. The statute clearly says that the nursing home must demonstrate that the costs are directly related to patient care. The hearing examiner found that the nursing homes made no such demonstration and the nursing homes do not allege that they did. Therefore, the fine was properly disallowed.

18. Did DPW properly disallow dues paid to a nursing home association?

DPW disallowed approximately $11,000 in dues paid to a nursing home association under another subsection of the same rule and statute cited in the above issue. The arguments made by the nursing homes are identical to those above. We resolve them in the same manner.

Without authority, the nursing homes also contend that DPW and the statute in question violate their freedom of association. Since the nursing homes offer no authority, their contention will not be considered.

19. Did DPW properly disallow the nursing homes' expenses for the Decathlon Club and the Calhoun Beach Club?

■ DPW disallowed membership dues in the Decathlon Club and the Calhoun Beach Club. The hearing examiner found that four one-day seminars for employees were held at the Decathlon Club. However, the nursing homes did not establish the actual costs associated with these events. Furthermore, the hearing examiner found that it was unclear if the membership dues would have been the same whether these events were held or not. These findings were not challenged. Rather, in their brief the nursing homes state that they do not seek reimbursement for personal expenses through this appeal; they only seek to establish that when social clubs are used for business purposes, DPW must recognize the costs attributable to such business use.

Clearly, costs incurred in connection with memberships in organizations which are not either professional, technical, or business-related, are not allowable. Rule 9510.-0340, subpart 5 C and D. Equally clearly, the nursing homes have not established specific costs connected with the social clubs which are generally allowed by DPW. Therefore, the nursing homes are seeking an advisory opinion by asking this court to rule that when social clubs are used for business purposes, DPW must recognize the costs attributable to such business use. We will not issue an advisory opinion. *Izaak Walton League of American Endowment, Inc. v. State Department of Natural Resources*, 312 Minn. 587, 252 N.W.2d 852 (1977).

20. Who has the burden of proof?

■ The nursing homes contend that Rule 9510 is silent on the question of burden of proof and that DPW has, in effect,

applied an unpromulgated rule when it requires the nursing home to meet a burden of proof. While there is no section entitled "burden of proof" in Rule 9510, Rule 9510.-0150, subpart 1 requires the nursing home to submit reports covering the provider's normal fiscal year in order to receive a per diem rate for providing care to welfare recipients. Reports must be submitted under oath. Minn.Stat. § 256B.27, subd. 2 (1982). Reports are subject to audit. Minnesota Rule 9510.0150, subpart 7. All rates determined under Rule 9510 are subject to adjustment as the result of error or omission determined through audit. Minnesota Rule 9510.0060.

Given these conditions, we find that the burden of proof is on the nursing homes.

21. Were the nursing homes denied due process when the prosecuting special assistant attorney general reviewed the Commissioner's order for form before it was issued?

A special assistant attorney general was counsel for the DPW staff in this matter. Another special assistant attorney general was responsible for advising the Commissioner. Their supervisor asked the counsel for the DPW staff to review a draft order for form. The supervisor made minor changes in the draft before forwarding it to the deputy commissioner.

The nursing homes contend that they were denied due process in this hearing because the prosecuting and adjudicating functions were not properly separated.

We have reviewed affidavits submitted by the Commissioner, the deputy commissioner, and the supervising special assistant attorney general. Based on the affidavits, we are completely satisfied that the prosecuting special assistant attorney general reviewed the draft order for form only and that the decision maker, the Commissioner, remained unbiased. As long as the decision-maker remains unbiased, due process is not offended. *Urban Council on Mobility v. Minnesota Department of Natural Resources*, 289 N.W.2d 729, 736 (Minn.1980). In contrast to *Schmidt v. In-*

*dependent School District No. 1, Aitkin, Minnesota*, 349 N.W.2d 563 (Minn.Ct.App. 1984), the risk of bias in this case was not great. Nevertheless, counsel for the staff should not have had the opportunity to see, much less review, a draft order prepared for the Commissioner. Such a practice creates an appearance of possible prejudice as well as a risk of bias and must not be repeated. *See id.*

## DECISION

We affirm the decision of the Commissioner in this case with one modification. The nursing homes are not entitled to a thirty-three cent known cost increase for fuel oil but, rather, are entitled to the same fifteen percent known cost increase allowed to other providers.